PHILLIP A. TALBERT
United States Attorney
AUDREY B. HEMESATH
MATTHEW THUESEN
KEVIN KHASIGIAN
Assistant United States Attorneys
501 I Street
Sacramento, CA 95814
Tel: 916-554-2700

Attorneys for Plaintiff
United States of America

**FILED**

Dec 14, 2023

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

# SEALED

## IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SHAHRIAR "SEAN" LOLOEE and KARLA MONTOYA,<br><br>Defendants. | CASE NO. **2:23-cr-0320 KJM**<br><br>18 U.S.C. § 371 – Conspiracy to Defraud the Department of Labor, to Commit Immigration Document Fraud, and to Obstruct Justice; 18 U.S.C. § 1546(a) – Possession of False Immigration Documents (14 counts); 18 U.S.C. § 1546(b) – Use of a False Immigration Document (2 counts); 18 U.S.C. § 1505(c) – Obstruction of Agency Proceedings (2 counts); 18 U.S.C. § 1519 –Falsification of Records (3 counts); 18 U.S.C. § 1343 – Wire Fraud (3 counts); 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal Forfeiture |

## INDICTMENT

The Grand Jury charges:

### INTRODUCTORY ALLEGATIONS

At all relevant times:

#### Entities and Individuals

1.      Viva Supermarkets was a chain of Sacramento-area grocery stores that included:

(a)     SL One Global, Inc., doing business as Viva Supermarket #1, which was incorporated on or about January 2, 2008, and located at 4211 Norwood Avenue, Sacramento, California;

(b)     Uni Foods, Inc., doing business as Viva Supermarket #2, which was incorporated

INDICTMENT

1

on or about August 28, 2008, and located at 925 North Adams Street, Dixon, California, until on or about September 3, 2021, when the store was sold;

(c)    SMF Global, Inc., doing business as Viva Supermarket #3, which was incorporated on or about June 24, 2014, and located at 3845 Marysville Boulevard, Sacramento, California;

(d)    Nari Trading, Inc., doing business as Viva Supermarket #4, which was incorporated on or about June 24, 2014, and located at 10385 Folsom Boulevard, Rancho Cordova, California.

2.    Viva Supermarkets maintained a corporate office in an office park with the addresses 4750 and 4758 Duckhorn Drive, Sacramento, California.

3.    Fresh Pak Produce, LLC, was a corporate entity, described as in the business of "produce wholesale," located in Sacramento, California, which was dissolved on or about April 1, 2020.

4.    Food Plus, LLC, was a corporate entity located in Sacramento, California.

5.    SHAHRIAR "SEAN" LOLOEE was an owner and managing shareholder of each of the corporate entities identified in paragraphs 1 through 4 above. LOLOEE solely owned each corporation, with the exception of Nari Trading, of which one of his family members owned 10%, and LOLOEE owned the remaining 90%. As an owner and managing shareholder of the corporations, LOLOEE was responsible for setting employee wages and hours, and had the authority to hire and fire employees.

6.    KARLA MONTOYA was the General Manager of each of the Viva Supermarkets identified in paragraph one. Her job responsibilities included hiring, firing, and disciplining employees, determining work schedules, and employment practices. MONTOYA began working at the Viva Supermarkets in or about November 2008, when LOLOEE employed her.

7.    Across all Viva Supermarket locations and the corporate headquarters, LOLOEE employed approximately 150 individuals at any given time.

8.    Each of the Viva Supermarkets was an authorized agent of Western Union Financial Services, Inc. ("Western Union"), and maintained an embedded Western Union office at each store location. LOLOEE was the authorized signatory for each of the Western Union offices.

9.    The United States Department of Labor ("Department of Labor") was a United States

INDICTMENT

2

government agency with authority to investigate potential labor violations under the Fair Labor Standards Act of 1938 ("Fair Labor Standards Act"), among other statutes. The Wage and Hour Division of the United States Department of Labor ("Wage and Hour Division") had authority to investigate, among other things, whether employees were being paid properly according to applicable federal labor laws.

### Employment of Undocumented Workers at the Viva Supermarkets

10.    Background on I-9 Verification. Federal law required employers to verify a job candidate's eligibility to work in the United States before employment could commence. This verification was accomplished by an employer and employee completing a United States Citizenship and Immigration Services Form I-9, Employment Eligibility Verification. In addition to the form, applicants were required to submit to the employer documents as evidence of their identity and employment authorization. Among the acceptable list of documents to verify employment authorization were a Permanent Resident Card and a Social Security card with an accompanying identity document. Employers were required to examine the documents to determine whether they appeared genuine and record the document information on the employee's Form I-9. The employer also was required to certify, among other things, that it reviewed the documents, the documents appeared genuine, and, to the best of its knowledge, the employee was authorized to work in the United States.

11.    Use of Fraudulent Documents at Viva Supermarkets. Beginning as early as in or about November 2008 and continuing through in or about October 2023, LOLOEE and MONTOYA hired and employed workers at the Viva Supermarkets who used fraudulent documents to satisfy the I-9 employment verification requirement.

12.    Montoya Herself Used Fraudulent Documents. MONTOYA herself lacked employment eligibility to work in the United States, but her personnel file at the Viva Supermarkets contained a fraudulent Permanent Resident Card, in order to give the appearance of employment eligibility. In addition, MONTOYA's personnel file contained a Social Security card bearing a Social Security number that belonged to a United States citizen who had passed away in September 2007, for the purpose of giving the appearance that she was eligible to work in the United States.

13.    Purpose of Hiring Undocumented Workers. MONTOYA, at LOLOEE's direction,

INDICTMENT

3

regularly hired undocumented workers at the Viva Supermarkets because it was LOLOEE's view that undocumented workers were easier to control. LOLOEE had knowledge of the practice of hiring undocumented workers and himself reviewed job applicants. By maintaining a workforce of undocumented workers, LOLOEE enriched himself in various ways, including by not paying them overtime wages that would otherwise be required.

14.    LOLOEE and MONTOYA used various means of controlling the undocumented workforce at the supermarkets, including (a) stating that LOLOEE knew who was "illegal," to create an atmosphere of intimidation; (b) threatening workers with adverse immigration consequences if they acted against LOLOEE's interest; (c) requiring attendance at all-hands meetings at which adverse immigration consequences were threatened; (d) requiring employees who did not speak English to sign untranslated documents as a condition of employment, and then threatening the employees with the content of the signed documents; (e) stating that they knew personal information such as where undocumented workers lived, in order to suggest that these workers were vulnerable to being turned in to immigration authorities; and (f) stating that LOLOEE knew many important people who could investigate the members of the workforce in order to intimidate them.

15.    MONTOYA and LOLOEE hired undocumented workers at the Viva Supermarkets to reduce labor costs illegally, among other reasons. LOLOEE and MONTOYA deployed this system of maintaining an undocumented labor force in all Viva Supermarkets across many years and through at least in or about October 2023.

16.    Methods of Hiring Undocumented Workers. In some instances, MONTOYA directed job candidates who admitted that they did not possess lawful employment authorization documents to obtain fraudulent documents from locations in South Sacramento. In at least one instance, MONTOYA herself obtained a fraudulent document for an undocumented applicant. In other instances, MONTOYA accepted for verification purposes documents that she knew were fraudulent.

17.    In October 2023, fraudulent employment authorization information, including fraudulent Social Security cards and fraudulent Permanent Resident cards, were contained in the personnel files of at least 289 Viva Supermarket employees.

//

INDICTMENT

4

*Irregular and Off-the-Books Payments of Viva Supermarkets Employees*

18.    LOLOEE's employment of undocumented employees allowed him to pay them in irregular ways and off-the-books, because LOLOEE understood that these employees were vulnerable and lacked negotiating leverage regarding the method of payment.  The purpose of paying undocumented employees in irregular ways and off-the-books was it allowed LOLOEE to avoid paying overtime wages, among other benefits.

19.    LOLOEE evolved the methods by which he paid undocumented workers over time to adapt to changing circumstances, but always with the goal of minimizing the expense of his labor force.

20.    Payment in Cash.  From at least in or about 2018 through in or about March 2020, LOLOEE paid certain undocumented workers their wages in cash, and typically without providing a paystub.

21.    Payment From a Different Corporate Entity.  From at least as early as in or about January 1, 2017, through in or about May 2017, LOLOEE paid certain Viva Supermarket workers, including MONTOYA, with checks from Food Plus, LLC, the entity that provided administrative services to each of the Viva Supermarkets, even though those employees did not work at or for Food Plus, LLC, but rather worked at one of the Viva Supermarket locations.

22.    Green Checks.  From at least in or about May 2017 through in or about January 2020, certain employees received wages via what purported to be a check from Fresh Pak Produce, LLC.  Employees understood that generally these "checks" could not be remitted at a financial institution—indeed, in many instances, the "checks" said "void" on their face.  Viva Supermarket employees referred to these "checks" as "green checks" for the green paper on which they were printed.

23.    LOLOEE and MONTOYA instructed Viva Supermarket employees that the green checks were like receiving cash and had to be cashed at the Western Union offices within the Viva Supermarkets.  The "checks" contained a paycheck stub attached.  As a means of maintaining secrecy over this irregular payment method, LOLOEE and MONTOYA told employees that the green checks were not real paystubs and were not to be photocopied or presented at any office.

24.    Employees were charged 2% to cash their checks at the Viva Supermarket Western Unions as a surcharge that benefitted LOLOEE.  No taxes or withholdings were withheld from the green

INDICTMENT

5

checks.

25.    None of the green checks were reported as wages on any of the employment tax returns filed for any of LOLOEE's businesses.

26.    Payment in Store Vouchers.  LOLOEE occasionally required that a portion of employees' pay be redeemed as a store voucher that could be used only for purchases at Viva Supermarkets. LOLOEE carried out this directive by requiring green checks or cash pay to be facilitated via the embedded Western Union franchises, which would distribute the vouchers as a portion of the employees' pay.

27.    Payment in Part in Check and in Part in Cash.  LOLOEE evolved his payment method over time to include paying employees their regular hours per pay period via bank check, and then any additional hours in cash, to avoid documentation of any overtime hours.  The Fair Labor Standards Act required overtime pay for hours worked over 40 in a workweek at a rate not less than one and a half times an employee's regular rate of pay, except for certain exempt workers.  LOLOEE did not pay the required overtime wage for the overtime hours; rather, he continued to pay the regular hours wage for the overtime hours.

28.    Salary Payments.  In or about 2020, in an effort to avoid paying overtime wages, among other purposes, LOLOEE transitioned employees who were previously paid hourly to "salary" positions. The purportedly salaried employees were assigned no higher than the hourly wage the employees were making, and, in some instances, the salaried wage was lower.  LOLOEE deemed these positions to be "salary" positions even if the employee job responsibilities did not correspond to job duties exempted from the overtime pay requirements of the Fair Labor Standards Act.  By reassigning employees to a salaried position, LOLOEE tried to avoid paying his employees overtime wages for overtime work and also tried to reduce his employment tax liability.

### Labor Violations and Obstruction of Labor Investigations

29.    The United States Department of Labor, Wage and Hour Division conducted three investigations involving Viva Supermarkets.  During these investigations, Department of Labor investigators conducted interviews and site visits to verify, among other things, that workers at Viva Supermarkets were paid properly according to applicable federal labor laws.

INDICTMENT

6

30.    The employment of undocumented workers emboldened LOLOEE and MONTOYA to commit labor violations based on the assumption that undocumented workers would be less likely to complain about the employment conditions.  LOLOEE exercised control over his undocumented workforce to attempt to thwart federal labor investigations into his supermarkets.

31.    First Department of Labor Investigation.  The Wage and Hour Division began an investigation into the wage and hour practices of SL One Global, Inc. (Viva Supermarket), and LOLOEE, from on or about November 10, 2008, through on or about May 26, 2009.  In the course of this investigation, the Wage and Hour Division determined that SL One Global, Inc., and LOLOEE had violated multiple provisions of the Fair Labor Standards Act (29 U.S.C. §§ 201, et. seq.), including a finding that LOLOEE and his corporate entity owed employees of Viva Supermarkets back wages.  LOLOEE and his corporate entity entered into a written agreement to pay approximately $3,496.18 in back wages.

32.    Second Department of Labor Investigation.  The Wage and Hour Division began a second investigation into the wage and hour practices of LOLOEE from between on or about February 20, 2018, through on or about February 19, 2020.  The second investigation focused on the Norwood Viva Supermarket location.  This second investigation revealed that LOLOEE had again violated the Fair Labor Standards Act, including its overtime pay requirements set forth in 29 U.S.C. § 207.  The agency made a finding that LOLOEE and his corporate entity once again owed employees back pay.  LOLOEE and his corporate entity entered a written agreement to pay approximately $35,423.35 in back wages.

33.    Third Department of Labor Investigation.  The Wage and Hour Division began a third investigation in or about September 2020 into the wage and hour practices of LOLOEE.  This third investigation initially also focused on the Norwood Viva Supermarket location, and only from between in or about February 2020 to in or about November 2020.  In or about February 2021, the agency expanded the investigation to include all Viva Supermarket locations and a three-year period from between in or about October 23, 2017 through in or about May 16, 2021.  As part of this third investigation, the Wage and Hour Division sent an agency investigator to the Viva Supermarket stores for the purpose of encountering employees in their workplace and conducting interviews.  Agency

INDICTMENT

7

investigators also conducted interviews of both LOLOEE and MONTOYA in furtherance of their investigation. In 2022, the Department of Labor filed a lawsuit under the Fair Labor Standards Act relating to the agency's investigation of LOLOEE, MONTOYA, and the Viva Supermarkets. At the conclusion of this third investigation, the Wage and Hour Division informed LOLOEE that the agency was seeking to collect approximately $1,500,000 in back wages, liquidated damages, and civil monetary penalties.

34. Obstructive Conduct. To discourage Viva Supermarket employees from complying with the Department of Labor investigations, LOLOEE and MONTOYA employed various tactics, including: (a) threatening adverse immigration consequences if employees cooperated with the agency's investigation; (b) directing employees to lie about aspects of their employment, including the start date of their Viva Supermarkets employment; (c) directing employees to work in secluded areas of the store in order to prevent contact with agency investigators; (d) instructing employees not to speak with agency investigators; (e) directing some employees to impersonate agency investigators in order to gather information and identify other employees who cooperated with the agency's investigation; (f) directing employees to take off their store uniforms to make them look like customers when agency investigators were present; (g) listening in on at least one employee interview with agency investigators to influence the answers provided; (h) hiring someone to act as though they were a customer while following the agency investigator through the store to learn what the investigator was asking about and being told; and (i) manipulating employee schedules to avoid having undocumented workers and other employees who may be forthright with the investigator present when the investigator visited the stores.

35. Return of Back Wages. In addition, without the knowledge or approval of the Department of Labor, LOLOEE and MONTOYA asked employees who had received back wage payments in resolution of the second Wage and Hour Division investigation to return those payments to LOLOEE.

36. Loloee Made False Statements to Investigators. LOLOEE was interviewed by Department of Labor investigators and made false statements, including the false statements that he never paid employees in green checks, cash, or any other irregular manner.

37. Montoya Made False Statements to Investigators. MONTOYA also made false

INDICTMENT

8

statements to a Department of Labor investigator, including, among others, that no employee had ever received cash payments, and that all employees had always been paid with paychecks.

COUNT ONE: [18 U.S.C. § 371 – Conspiracy to Defraud the United States and to Violate 18 U.S.C. §§ 1546 and 1505]

The Grand Jury charges:

SHAHRIR "SEAN" LOLOEE and
KARLA MONTOYA,

defendants herein, as follows:

## THE CONSPIRACY AND ITS OBJECTS

1.    Beginning in at least in or about April 2014 and continuing through in or about October 2023, in the State and Eastern District of California and elsewhere, LOLOEE and MONTOYA did knowingly and intentionally combine, conspire, confederate and agree with each other and with others known and unknown to the Grand Jury to defraud the United States and an agency thereof, to wit, the United States Department of Labor, and to commit offenses against the United States of America, to wit, to violate Title 18, United States Code, Sections 1546(a), 1546(b), and 1505.  The following were each objects of the conspiracy:

(a)    To defraud the United States and the United States Department of Labor by and through deceitful and dishonest means for the purpose of impeding, impairing, obstructing, and defeating the lawful governmental functions of the Department of Labor in investigating, assessing, and enforcing violations of applicable federal labor laws, to wit, federal overtime pay requirements;

(b)    To knowingly use, attempt to use, possess, obtain, accept, and receive any document prescribed by statute and regulation as evidence of authorized employment in the United States, knowing it to be forged, counterfeited, altered, and falsely made, and to have been otherwise procured by fraud and unlawfully obtained, in violation of Title 18, United States Code, Section 1546(a);

(c)    To use an identification document, knowing and having reason to know that the document was not issued lawfully for the use of the possessor, and knowing and having reason to know that the document was false, for the purpose of satisfying a requirement

INDICTMENT

9

of section 274A(b) of the Immigration and Nationality Act, in violation of Title 18, United States Code, Section 1546(b); and

(d)   To corruptly influence, obstruct, and impede, and endeavor to influence, obstruct, and impede, the due and proper administration of the law under which a pending proceeding regarding potential violations of federal labor laws was being had before the United States Department of Labor, Wage and Hour Division, in violation of Title 18, United States Code, Section 1505.

## MANNER AND MEANS

In furtherance of the conspiracy, LOLOEE and MONTOYA employed, among others, the following ways and means:

2.   It was a part of the conspiracy that LOLOEE and MONTOYA engaged in and caused others to engage in the conduct described in the Introductory Allegations of this Indictment.   Paragraphs 1 through 37 of the Introductory Allegations of this Indictment are realleged and incorporated by reference as though fully set forth herein.

3.   It was also a part of the conspiracy that LOLOEE and MONTOYA committed and caused to be committed the overt acts listed below.

## OVERT ACTS

4.   In furtherance of said conspiracy and to accomplish its objects, at least one of the conspirators committed, or caused to be committed, in the State and Eastern District of California, the following overt acts, among others:

(a)   In or about November 2008, LOLOEE employed MONTOYA at the Viva Supermarket Norwood location.  MONTOYA lacked employment eligibility in the United States and has never been eligible for employment in the United States.

(b)   In or about April 2014, MONTOYA instructed Employee 1 to go to a location in South Sacramento in order to obtain fraudulent employment documents.  MONTOYA then accepted these fraudulent documents for verification of Employee 1's employment eligibility.

(c)   In or about April 2014, LOLOEE and MONTOYA hired Employee 1 for a position at

INDICTMENT

10

Viva Supermarkets.

(d)    In or about August 2016, MONTOYA accepted a fraudulent Social Security card to hire Employee 2 at Viva Supermarkets.

(e)    In or about February 2017, LOLOEE and MONTOYA accepted a fraudulent Social Security card and a fraudulent Permanent Resident Card to hire Employee 16 at Viva Supermarkets.

(f)    In or about March 2017, MONTOYA accepted a fraudulent Social Security card to hire Employee 3 at Viva Supermarkets.

(g)    In or about April 2020, LOLOEE and MONTOYA hired Employee 4 for a position at Viva Supermarkets.

(h)    In or about April 2020, MONTOYA accepted a fraudulent Social Security card to hire Employee 4 at Viva Supermarkets.

(i)    In or about February 2020, MONTOYA directed one or more individuals to follow Wage and Hour Division investigators while they conducted site visits at the Viva Supermarket locations, to listen to investigators' conversations with employees.

(j)    In or about February 2020, MONTOYA and LOLOEE directed and caused others to direct certain employees to hide during one or more Wage and Hour Division investigator visits.

(k)    In or about February 2020, during the second Department of Labor investigation, LOLOEE held an all-hands meeting of Viva Supermarket employees at which LOLOEE stated that he wanted to know if workers were with him or against him, and indicated that if they were against him that they should leave.

(l)    In or about February 2020, MONTOYA stated to a Department of Labor investigator that no employee works more than 40 hours per week.

(m)    On or about May 14, 2020, LOLOEE told a Department of Labor investigator that he did not pay any Viva Supermarket employees in cash.

(n)    In or about May 2020, LOLOEE provided the Department of Labor a list of Viva Supermarket employees in connection with the second investigation. The list that

INDICTMENT

11

LOLOEE provided listed a 2020 hire date for employees who had actually been employed by LOLOEE for years.

(e)   In or about 2020, LOLOEE called Employee 5 into his office. LOLOEE instructed Employee 5 to deposit the back wages check she had received from the settlement of the second Department of Labor investigation into a bank, but then to give the money back to LOLOEE.

(f)   In or about 2020, MONTOYA instructed Employee 6 that she had to return the back wages she had received from the settlement of the second Department of Labor investigation to LOLOEE. MONTOYA said that LOLOEE does not owe anyone money and that every employee was paid what they were owed. MONTOYA further stated that LOLOEE was obligated to pay his employees with those settlement checks but reemphasized that nothing was owed to the employees.

(g)   In or about late 2020, MONTOYA directed Employee 3 into a Viva Supermarket administrative office and informed her that Viva Supermarkets was once again being investigated by the Department of Labor. MONTOYA instructed Employee 3 to tell the investigators that she started working at the Viva Supermarkets that same year, 2020, when in truth and as MONTOYA knew, Employee 3 had been a Viva Supermarkets employee since at least in or about 2017.

(h)   In or about late 2020, LOLOEE held an all-hands meeting regarding the third Department of Labor investigation. At this meeting, LOLOEE demanded that any employee who received a letter communication from the Wage and Hour Division should provide the letter to him.

(i)   On or about April 2, 2021, after LOLOEE came to possess letters from the Department of Labor attempting to contact Viva Supermarket employees regarding the third investigation commenced in September 2020, LOLOEE claimed to a Department of Labor investigator that the employees had given him the letters voluntarily.

(j)   On or about November 19, 2020, LOLOEE told a Department of Labor investigator that it was not true that he had requested back wage money to be paid back to him from any

INDICTMENT

12

Viva Supermarket employees.

(k)     In or about November 2020, LOLOEE provided the Department of Labor a list of Norwood location Viva Supermarket employees in connection with the third Wage and Hour Division investigation.  The list that LOLOEE provided listed a 2020 employment hire date for employees who had actually been employed by LOLOEE for much longer.

(l)     In or about December 2020, LOLOEE and MONTOYA directed that undocumented employee Employee 7 repay LOLOEE the back wages that LOLOEE had paid to him as a result of the second Department of Labor investigation and settlement.

(m)     In or about December 2020, LOLOEE directed undocumented employee Employee 7 to deposit the back wages check before repaying the back wages to LOLOEE.

(n)     On or about March 22, 2021, during the third Department of Labor investigation, MONTOYA joined and listened in on an employee interview with an agency investigator to influence that employee into denying that he had been asked to repay back wages that LOLOEE had paid him.

(o)     On or about February 19, 2021, LOLOEE told Department of Labor investigators that he never told any employees to "bring the money back," in reference to the returned back wage payments.

(p)     On or about February 19, 2021, LOLOEE told Department of Labor investigators that employees had never been paid in cash or in green checks.

(q)     In or about February 2021, LOLOEE provided the Department of Labor with Excel spreadsheets of Viva Supermarket employees at all four Viva Supermarket locations for the period of October 23, 2017, through in or about May 16, 2021.  These spreadsheets indicated a 2020 hire date for employees who had been hired well before 2020.

(r)     On or about March 12, 2021, LOLOEE told a Department of Labor investigator that "we have never paid anyone in cash."

(s)     On or about March 16, 2021, MONTOYA told a Department of Labor investigator that she was not aware of any Viva Supermarket employees returning back wage payments to LOLOEE, and that she did not ask any employees to return the back wage payments.

INDICTMENT

13

(t)   On or about March 16, 2021, MONTOYA told a Department of Labor investigator that no Viva Supermarket employee had ever received cash payments, and that all employees have always been paid in paychecks.

(u)   On or about June 17, 2021, LOLOEE stated to Wage and Hour Division Investigators that none of his employees was ever paid in cash, voucher, or green check.

(v)   On or about June 17, 2021, specific to the green checks, LOLOEE posited to Department of Labor investigators that his office was broken into a few years ago, and that perhaps the green checks were stolen at that time, as a way to explain Viva Supermarkets employees receiving pay via the green checks.

(w)   On or about June 17, 2021, LOLOEE stated to Department of Labor investigators that Fresh Pak Produce, LLC, had been inactive for four years and had no relation to Viva Supermarkets.

(x)   On or about June 17, 2021, LOLOEE claimed to Department of Labor investigators that he was not affiliated with the Western Union locations in his stores.

(y)   In or about October 2021, MONTOYA and LOLOEE hired Employee 8 for a position at Viva Supermarkets.

(z)   In or about October 2021, MONTOYA accepted a fraudulent Social Security card to hire Employee 8 at Viva Supermarkets.

All in violation of Title 18, United States Code, Section 371.

COUNTS TWO THROUGH FIFTEEN:  [18 U.S.C. § 1546(a) – Possession of False Immigration Documents; 18 U.S.C. § 2 – Aiding and Abetting]

The Grand Jury further charges: T H A T

SHAHRIAR "SEAN" LOLOEE and
KARLA MONTOYA,

defendants herein, on or about the dates listed below, in the State and Eastern District of California, did knowingly use, attempt to use, possess, obtain, accept, and receive any document prescribed by statute or regulation as evidence of authorized employment in the United States, knowing it to be forged, counterfeited, altered, and falsely made, and to have been otherwise procured by fraud and unlawfully obtained, and did knowingly aid, abet, assist, counsel, command, induce, and procure the same, in

INDICTMENT

14

violation of Title 18, United States Code, Sections 2 and 1546(a), as set forth more fully in the table below:

| Count | On or About Possession Date | Fraudulent Document | Name of Employee |
|---|---|---|---|
| 2 | June 2018 to October 2023 | Social Security card and Permanent Resident Card | Employee 9 |
| 3 | January 2016 to October 2023 | Social Security card and Permanent Resident Card | Employee 10 |
| 4 | August 2018 to October 2023 | Social Security card and Permanent Resident Card | Employee 11 |
| 5 | March 2017 to March 2021 | Social Security card and Permanent Resident Card | Employee 3 |
| 6 | September 2014 to October 2023 | Social Security card and Permanent Resident Card | Employee 12 |
| 7 | November 2018 to October 2023 | Social Security card and Permanent Resident Card | Employee 13 |
| 8 | January 2016 to September 2020 | Social Security card and Permanent Resident Card | Employee 14 |
| 9 | January 2015 to March 2020 | Social Security card and Permanent Resident Card | Employee 1 |
| 10 | August 2016 to May 2021 | Social Security card | Employee 2 |
| 11 | November 2018 to October 2023 | Social Security card and Permanent Resident Card | Employee 15 |
| 12 | February 2017 to October 2023 | Social Security card and Permanent Resident Card | Employee 16 |
| 13 | April 2018 to October 2023 | Social Security card and Permanent Resident Card | Employee 17 |
| 14 | July 2017 to October 2023 | Social Security card and Permanent Resident Card | Employee 18 |
| 15 | April 2016 to October 2023 | Social Security card and Permanent Resident Card | Karla MONTOYA |

All in violation of Title 18, United States Code, Sections 2 and 1546(a).

COUNTS SIXTEEN THROUGH SEVENTEEN:  [18 U.S.C. § 1546(b) – Use of a False Immigration Document; 18 U.S.C. § 2 – Aiding and Abetting]

The Grand Jury further charges: T H A T

SHAHRIAR "SEAN" LOLOEE and
KARLA MONTOYA,

defendants herein, on or about the dates listed below, in the State and Eastern District of California, did use an identification document, knowing and having reason to know that the document was not issued

INDICTMENT

15

lawfully for the use of the possessor, and knowing and having reason to know that the document was false, for the purpose of satisfying a requirement of section 274A(b) of the Immigration and Nationality Act, and did knowingly aid, abet, assist, counsel, command, induce, and procure the same, in violation of Title 18, United States Code, Sections 2 and 1546(b), as set forth more fully in the table below:

| Count | On or About Use Date | Fraudulent Document | Name of Employee |
|-------|---------------------|---------------------|------------------|
| 16 | October 2021 | Social Security card | Employee 8 |
| 17 | April 2020 | Social Security card | Employee 4 |

All in violation of Title 18, United States Code, Sections 2 and 1546(b).

COUNT EIGHTEEN: [18 U.S.C. § 1505 – Obstruction of Agency Proceeding]

The Grand Jury further charges:

SHAHRIAR "SEAN" LOLOEE and
KARLA MONTOYA,

defendants herein, as follows:

1.     The factual allegations contained in paragraphs 1 through 37 of the Introductory Allegations and paragraphs 3 through 4 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.     From in or about January 2020 through in or about September 2020, in the State and Eastern District of California and elsewhere, LOLOEE and MONTOYA did corruptly influence, obstruct, and impede and endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before any department or agency of the United States, that is, the second Department of Labor Wage and Hour Division investigation of Viva Supermarkets, by, among other actions, directing and causing others to direct certain workers to hide to prevent those workers from being questioned by agency investigators, and by providing materially false statements to a Department of Labor investigator regarding the employees working at Viva Supermarkets and overtime pay, in violation of Title 18, United States Code, Sections 2 and 1505.

//

//

INDICTMENT

16

COUNT NINETEEN: [18 U.S.C. § 1505 – Obstruction of Agency Proceeding]

The Grand Jury further charges:

SHAHRIAR "SEAN" LOLOEE and
KARLA MONTOYA,

defendants herein, as follows:

1.      The factual allegations contained in paragraphs 1 through 37 of the Introductory Allegations and paragraphs 3 through 4 of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      From in or about November 2020 through in or about July 2021, in the State and Eastern District of California and elsewhere, LOLOEE and MONTOYA did corruptly influence, obstruct, and impede, and endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before any department or agency of the United States, that is, the third Department of Labor Wage and Hour Division investigation of Viva Supermarkets, by, among other actions, demanding investigation letters received by employees as a means of obstructing employee participation in the investigation, by directing at least one employee to lie to agency investigators about her employment start date, by listening in on an employee interview with an agency investigator for the purpose of influencing the employee to make materially false statements, and by providing materially false statements to Department of Labor investigators regarding the manner of payments to employees working at Viva Supermarkets and overtime pay, in violation of Title 18, United States Code, Sections 2 and 1505.

COUNTS TWENTY THROUGH TWENTY-TWO: [18 U.S.C. § 1519 – Falsification of Records]

The Grand Jury further charges:

SHAHRIAR "SEAN" LOLOEE,

defendant herein, as follows:

1.      The factual allegations contained in paragraphs 1 through 37 of the Introductory Allegations and paragraphs 3 through 4 of Count One of this Indictment are realleged and incorporated as though fully set forth herein.

2.      On or about the following dates, in the State and Eastern District of California and

INDICTMENT

17

elsewhere, LOLOEE did knowingly alter, falsify, and make a false entry in a record and document with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of any department or agency of the United States, that is, the Department of Labor Wage and Hour Division investigations of Viva Supermarkets, as detailed more fully in the table below:

| Count | On or About Date | Document | Matter |
|---|---|---|---|
| 20 | May 2020 | List of Viva Supermarket (Norwood location) employees from February 2018 through February 2020 | Second Wage and Hour Division investigation |
| 21 | November 2020 | List of Viva Supermarket (Norwood location) employees from February 2020 through November 2020 | Third Wage and Hour Division investigation |
| 22 | February 2021 | Excel Spreadsheet lists of Viva Supermarket (all locations) employees from October 2017 through February 2021 | Third Wage and Hour Division investigation |

All in violation of Title 18, United States Code, Sections 2 and 1519.

COUNTS TWENTY-THREE THROUGH TWENTY-FIVE: [18 U.S.C. § 1343 – Wire Fraud]

The Grand Jury further charges:

SHAHRIAR "SEAN" LOLOEE,

defendant herein, as follows:

### BACKGROUND

At all relevant times,

***The Small Business Administration***

1.      The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

//

INDICTMENT

18

*The Restaurant Revitalization Fund*

2.    The American Rescue Plan Act of 2021 ("ARP") was a federal law enacted in or around March 2021 that was designed to provide emergency financial assistance to the millions of Americans suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the ARP was the authorization of up to $28.6 billion in funding to restaurants and other eligible businesses for payroll and certain other expenses, through a program referred to as the Restaurant Revitalization Fund ("RRF"). The purpose of the RRF was to support the restaurant industry by providing funding to those that had suffered significant pandemic-related revenue loss. The RRF also included specific requirements to ensure equitable distribution to small business concerns owned by women, veterans, and socially and economically disadvantaged applicants.

3.    Under the RRF, the SBA provided funding of up to $5,000,000 per location (not to exceed $10,000,000 total for the applicant and any affiliated businesses) for applicants who met certain conditions. The amount of an applicant's RRF award was calculated as the applicant's 2019 gross receipts, minus the applicant's 2020 gross receipts, minus the amount of any loans the applicant may have received under the Paycheck Protection Program, which was a source of relief provided by the Coronavirus Aid, Relief, and Economic Security Act.

4.    RRF awardees were not required to repay funds received under the RRF unless the funds were used for unauthorized purposes, if the funds were not used by March 11, 2023, or the awardee permanently closed before using all funds on authorized purposes. Authorized purposes included, among other things, payroll costs, payments on any business mortgage, business rent payments, business debt service, business utility payments, business maintenance expenses, construction of outdoor seating, business supplies, business food and beverage expenses, covered supplier costs, and business operating expenses.

5.    To obtain RRF funds, a qualifying business had to submit an application signed by an Authorized Representative of the business. The RRF application required the business, through its Authorized Representative, to make certain affirmative certifications to be eligible to obtain the RRF funds. In the RRF application, the business, through its Authorized Representative, had to state, among other things: (a) its 2019 gross receipts as reported on its 2019 federal tax return; (b) its 2020 gross

INDICTMENT

19

receipts as reported or to be reported on its 2020 federal tax return; (c) that the business had not permanently closed; and (d) that current economic uncertainty made the funding request necessary to support the ongoing or anticipated operations of the applicant. The Authorized Representative also had to certify that, by March 11, 2023, he or she would certify to the SBA that the business used all of the RRF funds only for authorized purposes. Additionally, the Authorized Representative had to certify that he or she understood that knowingly making a false statement to obtain a grant from SBA is punishable as a crime.

6. RRF applications were received through a cloud-based platform through the AWS GOV server located in Oregon. The SBA transmitted RRF funds to awardees through the United States Department of Treasury's Financial Management Service ("FMS") server located in Virginia.

**SCHEME TO DEFRAUD**

7. From on or about May 3, 2021, through on or about March 11, 2023, in the State and Eastern District of California, defendant SHAHRIAR "SEAN" LOLOEE knowingly devised, intended to devise, and participated in a material scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, promises, half-truths, and the concealment of material facts.

**PURPOSE OF THE SCHEME**

8. The purpose of the scheme and artifice to defraud was for LOLOEE to enrich himself unlawfully by obtaining RRF funds through the submission of fraudulent RRF applications to the SBA.

**MANNER AND MEANS**

In furtherance of the scheme and artifice to defraud, LOLOEE employed, among others, the following manner and means:

9. LOLOEE submitted and caused to be submitted two fraudulent RRF applications to the SBA for the purpose of obtaining RRF funds.

10. On or about May 3, 2021, LOLOEE submitted and caused to be submitted to the SBA an RRF application on behalf of SMF Global, Inc., that he signed as the corporation's Authorized Representative. In the application, LOLOEE listed himself as the 100% owner of SMF Global, Inc., and requested that RRF funds be deposited in a Cathay Bank account he controlled that was held in the name

INDICTMENT

20

of SMF Global, Inc. LOLOEE included in the SMF Global, Inc., application materially false and fraudulent information, including a representation that SMF Global, Inc.'s 2020 gross receipts were approximately $3,800,000, when he knew the actual gross receipts were much greater than that amount and, in fact, were approximately $5,800,000. LOLOEE fraudulently reported SMF Global, Inc.'s gross receipts because he knew that, if he reported the actual amount, SMF Global, Inc., would be ineligible to receive RRF funds. Based on his false and fraudulent representation of SMF Global, Inc.'s 2020 gross receipts, LOLOEE requested approximately $1,039,000 in RRF funds. The SBA denied LOLOEE's request because he was unable to establish that SMF Global, Inc., qualified as a type of business eligible to receive RRF funds.

11. On or about May 3, 2021, LOLOEE submitted and caused to be submitted to the SBA an RRF application on behalf of Nari Trading, Inc., that he signed as the corporation's Authorized Representative. In the application, LOLOEE listed himself as the 100% owner of Nari Trading, Inc., and requested that RRF funds be deposited in a Cathay Bank account he controlled that was held in the name of Nari Trading, Inc. LOLOEE made materially false and fraudulent representations in the Nari Trading, Inc., application, including a representation that Nari Trading, Inc.'s 2020 gross receipts were approximately $5,200,000, when he knew the actual gross receipts were much greater than that amount and, in fact, were approximately $7,700,000. LOLOEE fraudulently reported Nari Trading, Inc.'s gross receipts because he knew that, if he reported the actual amount, Nari Trading, Inc., would be ineligible to receive RRF funds. Based on his false and fraudulent representation of Nari Trading, Inc.'s 2020 gross receipts, LOLOEE requested and received approximately $1,200,000 in RRF funds.

12. LOLOEE's false representations regarding the 2020 gross receipts of SMF Global, Inc. and Nari Trading, Inc. in his RRF applications had a natural tendency to influence, and were capable of influencing, SBA's decision whether to provide these companies RRF funds, and if so how much to provide. Businesses with a net increase in gross receipts from 2019 to 2020 were not eligible to receive RRF funds at all. For businesses with a net decrease in gross receipts from 2019 to 2020, the amount of RRF funding available depended on the size of that net decrease. By falsely reducing the 2020 gross receipts reported on his RRF applications, LOLOEE made his businesses appear eligible for over $2 million in RRF funding to which they were not entitled.

INDICTMENT

21

**USE OF THE INTERSTATE WIRES**

13.     On or about the dates listed below, in the State and Eastern District of California and elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud and attempting to do so, LOLOEE, as more specifically charged below, knowingly transmitted and caused to be transmitted by means of wire communications in interstate and foreign commerce the following writings, signs, signals, pictures, and sounds:

| Count | On or About Date | Wire Description |
|---|---|---|
| 23 | May 3, 2021 | Transmission of an RRF application to the SBA on behalf of SMF Global, Inc. |
| 24 | May 3, 2021 | Transmission of an RRF application to the SBA on behalf of Nari Trading, Inc. |
| 25 | May 25, 2021 | ACH transfer of approximately $1,198,486.71 from the SBA through the FMS to a Cathay Bank account ending 8380 in the name of Nari Trading, Inc., dba Viva Supermarket #4 |

All in violation of Title 18, United States Code, Sections 2 and 1343.

FORFEITURE ALLEGATION:   [18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal Forfeiture]

1.     Upon conviction of one or more of the offenses alleged in Counts Twenty-Three through Twenty-Five of this Indictment, defendant SHAHRIAR "SEAN" LOLOEE shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property, real and personal, which constitutes or is derived from proceeds traceable to such violations, including but not limited to the following:

    a.     Approximately $949,900.00 seized from Bank of America account number 0024 5216 6504,

    b.     Approximately $50,000.00 seized from Five Star Bank account number 3303096,

    c.     Approximately $22,465.94 seized from Cathay Bank account number 0022214070, and

    d.     A sum of money equal to the total amount of proceeds traceable to such offenses, for which defendant is convicted.

2.     If any property subject to forfeiture, as a result of the offenses alleged in Counts Twenty-Three through Twenty-Five of this Indictment, for which defendant is convicted:

    a.     cannot be located upon the exercise of due diligence;

INDICTMENT

22

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of defendant, up to the value of the property subject to forfeiture.

A TRUE BILL.

/s/ **Signature on file w/AUSA**

FOREPERSON

PHILLIP A. TALBERT
United States Attorney

INDICTMENT

23

No. _ _ _ _ _ _ _ _ _

2:23-cr-0320 KJM

## UNITED STATES DISTRICT COURT

*Eastern District of California*

*Criminal Division*

### THE UNITED STATES OF AMERICA
*vs.*

SHAHRIAR "SEAN" LOLOEE
KARLA MONTOYA

### I N D I C T M E N T

**VIOLATION(S):**   18 U.S.C. § 371 – Conspiracy to Defraud the Department of Labor, to Commit Immigration Document Fraud, and to Obstruct Justice
18 U.S.C. § 1546(a) – Possession of False Immigration Documents (14 Counts)
18 U.S.C. § 1546(b) – Use of False Immigration Document (2 Counts)
18 U.S.C. § 1505(c) – Obstruction of Agency Proceedings (2 counts)
18 U.S.C. § 1519 – Falsification of Records (3 Counts)
18 U.S.C. § 1343 – Wire Fraud (3 Counts)
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal Forfeiture

*A true bill,*

## /s/ Signature on file w/AUSA

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
*Foreman.*

                              14th
*Filed in open court this* _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ *day*

*of* _ _ December _ _ _ _ _ _ _ , *A.D. 20* _ 23 _ _

_ _ _ _ _ _ _ _ _ _ _ /s/ Shelly Her _ _ _ _ _ _ _ _ _ _ _ _ _
*Clerk.*

*Bail, $* _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
No bail bench warrants for both defendants.

_ _ _ _ _ _ _ _ _ _ _ _ _ _

December 14, 2023

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

2:23-cr-0320 KJM

**United States v. Loloee, Montoya**
**Penalties for Indictment**

**Defendants**
**SHAHRIAR LOLOEE**
**KARLA MONTOYA**

**COUNT 1:**        **ALL DEFENDANTS**

VIOLATION:        18 U.S.C. § 371 - Conspiracy

PENALTIES:        Up to five years' imprisonment; or
                  Fine of up to $250,000; or both fine and imprisonment
                  Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNTS 2-15:**        **ALL DEFENDANTS**

VIOLATION:        18 U.S.C. § 1546(a) – Possession of False Immigration Documents

PENALTIES:        Up to ten years' imprisonment; or
                  Fine of up to $250,000; or both fine and imprisonment
                  Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNTS 16-17:**        **ALL DEFENDANTS**

VIOLATION:        18 U.S.C. § 1546(b) – Use of False Immigration Documents

PENALTIES:        Up to ten years' imprisonment; or
                  Fine of up to $250,000; or both fine and imprisonment
                  Supervised release of up to 3 years

**COUNTS 18-19:**        **ALL DEFENDANTS**

VIOLATION:        18 U.S.C. § 1505 – Obstruction of Agency Proceeding

PENALTIES:        Up to five years' imprisonment; or
                  Fine of up to $250,000; or both fine and imprisonment
                  Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 20-22:**     **LOLOEE**

VIOLATION:          18 U.S.C. § 1519 – Falsification of Record

PENALTIES:          Up to twenty years' imprisonment; or
                    Fine of up to $250,000; or both fine and imprisonment
                    Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNTS 23-25:**     **LOLOEE**

VIOLATION:          18 U.S.C. § 1343 – Wire Fraud

PENALTIES:          Up to twenty years' imprisonment; or
                    Fine of up to $250,000; or both fine and imprisonment
                    Supervised release of up to 3 years

**FORFEITURE ALLEGATION:**    **LOLOEE**

VIOLATION:          18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal Forfeiture

PENALTIES:          As stated in the charging document