PHILLIP A. TALBERT
United States Attorney
AUDREY B. HEMESATH
MATTHEW THUESEN
KEVIN KHASIGIAN
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Tel: 916-554-2700

Attorneys for Plaintiff
United States of America

FILED

Mar 21, 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>              v.<br><br>SHAHRIAR "SEAN" LOLOEE,<br>KARLA MONTOYA,<br>MIRWAIS SHAMS, and<br>AHMAD "SHAH" SHAMS,<br><br><br>                          Defendants. | CASE NO.  2:23-CR-320 KJM<br><br>18 U.S.C. § 371 – Conspiracy to Defraud the Department of Labor, to Commit Immigration Document Fraud, and to Obstruct Justice; 18 U.S.C. § 371 – Conspiracy to Defraud the Internal Revenue Service; 18 U.S.C. § 1546(a) – Possession of False Immigration Documents (14 counts); 18 U.S.C. § 1546(a) – Possession, Acceptance and Receipt of False Immigration Documents (6 counts); 18 U.S.C. § 1505(c) – Obstruction of Agency Proceedings (2 counts); 18 U.S.C. § 1519 – Falsification of Records (3 counts); 26 U.S.C. § 7202 – Willful Failure to Collect or Pay Over Tax (16 counts); 26 U.S.C. § 7206(1) – False Tax Return (7 counts); 18 U.S.C. § 1343 – Wire Fraud (3 counts); 18 U.S.C. § 1956 – Money Laundering (3 counts); 18 U.S.C. § 1623(a) – Perjury (2 counts); 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c) – Criminal Forfeiture |

## SUPERSEDING INDICTMENT

### INTRODUCTORY ALLEGATIONS

At all relevant times:

#### *Entities and Individuals*

1.      Viva Supermarkets was a chain of Sacramento-area grocery stores that included:

        (a)     SL One Global, Inc., doing business as Viva Supermarket #1, which was

SUPERSEDING INDICTMENT

1

incorporated on or about January 2, 2008, and located at 4211 Norwood Avenue, Sacramento, California;

(b)    Uni Foods, Inc., doing business as Viva Supermarket #2, which was incorporated on or about August 28, 2008, and located at 925 North Adams Street, Dixon, California, until on or about September 3, 2021, when the store was sold;

(c)    SMF Global, Inc., doing business as Viva Supermarket #3, which was incorporated on or about June 13, 2014, and located at 3845 Marysville Boulevard, Sacramento, California; and

(d)    Nari Trading, Inc., doing business as Viva Supermarket #4, which was incorporated on or about June 24, 2014, and located at 10385 Folsom Boulevard, Rancho Cordova, California.

2.    Viva Supermarkets maintained a corporate office in an office park with the addresses 4750 and 4758 Duckhorn Drive, Sacramento, California.

3.    Fresh Pak Produce, LLC, was a corporate entity, described as in the business of "produce wholesale," located in Sacramento, California, which was dissolved on or about April 1, 2020.

4.    Food Plus, LLC, was a corporate entity located in Sacramento, California.

5.    SHAHRIAR "SEAN" LOLOEE was an owner and managing shareholder of each of the corporate entities identified in paragraphs 1 through 4 above. LOLOEE solely owned each corporation, with the exception of Nari Trading, of which one of his family members owned 10%, and LOLOEE owned the remaining 90%. As an owner and managing shareholder of the corporations, LOLOEE was responsible for setting employee wages and hours, and had the authority to hire and fire employees.

6.    KARLA MONTOYA was the General Manager of each of the Viva Supermarkets identified in paragraph 1 above. Her job responsibilities included hiring, firing, and disciplining employees, determining work schedules, and employment practices. MONTOYA began working at the Viva Supermarkets in or about November 2008, when LOLOEE employed her.

7.    MIRWAIS SHAMS (M. SHAMS) was the Controller and Financial Auditor of the Viva Supermarkets entities. His job responsibilities included overseeing the Viva Supermarkets general ledgers, accounting, resolving any issues relating to employee paychecks, and serving as a Viva

SUPERSEDING INDICTMENT

2

Supermarkets representative with Heartland Payroll. M. SHAMS began working at the Viva Supermarkets in or about June 2016, eventually becoming the sole controller, and continued working at the Viva Supermarket Duckhorn corporate offices through in or about March 2024.

8. AHMAD "SHAH" SHAMS (S. SHAMS) was employed in various capacities at Viva Supermarkets, including as the Human Resources director at the Viva Supermarkets corporate office, as a store manager at the Rancho Cordova location, as the Information Technology (IT) professional for Viva Supermarkets, and as the Customer Service manager. His job responsibilities included interviewing applicants for employment at the Rancho Cordova Viva Supermarket and serving as company representative with TimeClock Plus and Heartland Payroll. S. SHAMS and M. SHAMS are brothers. S. SHAMS began working at the Viva Supermarkets in or about July 2016, and continued to work at the Rancho Cordova location and the Duckhorn corporate office through in or about March 2024.

9. Across all Viva Supermarket locations and the corporate headquarters, LOLOEE employed approximately 150 individuals at any given time.

10. Each of the Viva Supermarkets was an authorized agent of Western Union Financial Services, Inc. ("Western Union"), and maintained an embedded Western Union office at each store location. LOLOEE was the authorized signatory for each of the Western Union offices.

11. TimeClock Plus was a company that offered payroll services to businesses across the United States, including Viva Supermarkets, from at least in or about 2012 through in or about March 2024. TimeClock Plus collected Viva Supermarkets employee punch-in and punch-out data via terminals in each Viva Supermarket store location. That data was then transmitted to TimeClock Plus, which then gave its clients, including Viva Supermarkets, the ability to edit that data manually or automatically before transmission to a payroll processing company.

12. Heartland Payroll (previously, Ovation Payroll) was a payroll processing corporation with headquarters in New Jersey and later Georgia that offered payroll and tax services to businesses across the United States, including Viva Supermarkets, for substantial periods of time from 2014 through 2016, and again from at least in or about March 2017 through at least in or about March 2024. For Viva Supermarkets, Heartland Payroll received the timekeeping data of employee hours and pay

SUPERSEDING INDICTMENT

3

rates, and then calculated tax withholdings, calculated any owed overtime payments, prepared preview reports to be approved by Viva Supermarkets, and once approved, printed paychecks that they then mailed back to the Viva Supermarkets corporate office in Sacramento, California. Heartland Payroll also prepared W2 Wage and Tax Statements and electronically filed tax returns, including Form 941 Employer's Quarterly Federal Tax Return with state and federal tax agencies.

13. The United States Department of Labor ("Department of Labor") was a United States government agency with authority to investigate potential labor violations under the Fair Labor Standards Act of 1938 ("Fair Labor Standards Act"), among other statutes. The Wage and Hour Division of the United States Department of Labor ("Wage and Hour Division") had authority to investigate, among other things, whether employees were being paid properly according to applicable federal labor laws. The Fair Labor Standards Act required, among other things, overtime pay for hours worked over 40 in a workweek at a rate not less than one and a half times an employee's regular rate of pay, except for certain exempt workers.

14. The Internal Revenue Service ("IRS") was an agency of the United States within the Department of Treasury responsible for administering the tax laws of the United States and collecting taxes owed to the United States. The Internal Revenue Code (Title 26 of the United States Code) contained statutes and laws of the United States concerning, among other things, tax liability. "Federal income tax" referred to the tax due to the United States under the Internal Revenue Code.

### *Employment of Undocumented Workers at the Viva Supermarkets*

15. Background on I-9 Verification. Federal law required employers to verify a job candidate's eligibility to work in the United States before employment could commence. This verification was accomplished by an employer and employee completing a United States Citizenship and Immigration Services Form I-9, Employment Eligibility Verification. In addition to the form, applicants were required to submit to the employer documents as evidence of their identity and employment authorization. Among the acceptable list of documents to verify employment authorization were a Permanent Resident Card and a Social Security card with an accompanying identity document. Employers were required to examine the documents to determine whether they appeared genuine and record the document information on the employee's Form I-9. The employer also was required to

certify, among other things, that it reviewed the documents, the documents appeared genuine, and, to the best of its knowledge, the employee was authorized to work in the United States.

16. Use of Fraudulent Documents at Viva Supermarkets. Beginning at least in or about November 2008, LOLOEE and MONTOYA hired and employed workers at the Viva Supermarkets who used fraudulent documents to satisfy the I-9 employment verification requirement.

17. Montoya Herself Used Fraudulent Documents. MONTOYA herself lacked employment eligibility to work in the United States until October 2023, but her personnel file at the Viva Supermarkets contained a fraudulent Permanent Resident Card, in order to give the appearance of employment eligibility. In addition, MONTOYA's personnel file contained a Social Security card bearing a Social Security number that belonged to a United States citizen who had passed away in September 2007, for the purpose of giving the appearance that she was eligible to work in the United States.

18. Purpose of Hiring Undocumented Workers. MONTOYA and others, at LOLOEE's direction, regularly hired undocumented workers at the Viva Supermarkets because it was LOLOEE's view that undocumented workers were easier to control. LOLOEE had knowledge of the practice of hiring undocumented workers and himself reviewed job applicants. By maintaining a workforce of undocumented workers, LOLOEE enriched himself in various ways, including by not paying them overtime wages that would otherwise be required and by avoiding paying payroll tax that he would owe if he correctly reported the labor of these workers.

19. LOLOEE and MONTOYA used various means of controlling the undocumented workforce at the supermarkets, including (a) stating that LOLOEE knew who was "illegal," to create an atmosphere of intimidation; (b) threatening workers with adverse immigration consequences if they acted against LOLOEE's interest; (c) requiring attendance at all-hands meetings at which adverse immigration consequences were threatened; (d) requiring employees who did not speak English to sign untranslated documents as a condition of employment, and then threatening the employees with the content of the signed documents; (e) stating that they knew personal information such as where undocumented workers lived, in order to suggest that these workers were vulnerable to being turned in to immigration authorities; and (f) stating that LOLOEE knew many important people who could

investigate the members of the workforce in order to intimidate them.

20.    LOLOEE, MONTOYA, and others acting at LOLOEE's direction, hired undocumented workers at the Viva Supermarkets to reduce labor costs illegally, among other reasons. LOLOEE deployed this system of maintaining an undocumented labor force in all Viva Supermarkets across many years and through at least in or about October 2023.

21.    Methods of Hiring Undocumented Workers. In some instances, MONTOYA directed job candidates who admitted that they did not possess lawful employment authorization documents to obtain fraudulent documents from locations in South Sacramento. In at least one instance, MONTOYA herself obtained a fraudulent document for an undocumented applicant. In other instances, MONTOYA accepted for verification purposes documents that she knew were fraudulent.

22.    In or about October 2023, fraudulent employment authorization information, including fraudulent Social Security cards and fraudulent Permanent Resident cards, were contained in the personnel files of at least 289 Viva Supermarket employees.

### Off-the-Books Payments of Viva Supermarkets Employees

23.    LOLOEE's employment of undocumented employees allowed him to pay them in irregular ways and off-the-books, because LOLOEE understood that these employees were vulnerable and lacked negotiating leverage regarding the method of payment. The purpose of paying undocumented employees in irregular ways and off-the-books was it allowed LOLOEE to avoid paying overtime wages, and to reduce payroll tax obligations, among other benefits. LOLOEE facilitated his off-the-books payments schemes primarily through M. SHAMS on the accounting side, and S. SHAMS on the human resources side.

24.    LOLOEE evolved the methods by which he paid undocumented workers over time to adapt to changing circumstances, but always with the goal of minimizing the expense of his labor force and tax obligations.

25.    Payment in Cash. From at least in or about 2018 through in or about March 2020, LOLOEE paid certain undocumented workers their wages in cash, and typically without providing a paystub.

26.    Payment From a Different Corporate Entity. From at least in or about January 2017

through in or about May 2017, LOLOEE paid certain Viva Supermarket workers, including MONTOYA, with checks from Food Plus, LLC, the entity that provided administrative services to each of the Viva Supermarkets, even though those employees did not work at or for Food Plus, LLC, but rather worked at one of the Viva Supermarket locations.

27.   Green Checks. From at least in or about May 2017 through in or about January 2020, certain employees received wages via Fresh Pak Produce, LLC. Viva Supermarket employees referred to these checks as "green checks" for the green paper on which they were printed. From in or about May 2017 through in or about December 2017, the Fresh Pak Produce green checks were real bank checks that could be remitted in a financial institution. Beginning in or about January 2018, LOLOEE directed M. SHAMS and others to void the checks at the time of issuance to employees, resulting generally in employees' inability to remit the green checks at a financial institution.

28.   LOLOEE and MONTOYA instructed Viva Supermarket employees that the green checks were like receiving cash and had to be cashed at the Western Union offices within the Viva Supermarkets. As a means of maintaining secrecy over this irregular payment method, LOLOEE and MONTOYA told certain employees that the green checks were not real paystubs and were not to be photocopied or presented at any office.

29.   Employees were charged 2% to cash their checks at the Viva Supermarket Western Unions as a surcharge that benefitted LOLOEE. No taxes or withholdings were withheld from the green checks.

30.   None of the green checks were reported as wages on any of the employment tax returns filed for any of LOLOEE's businesses.

31.   Payment in Store Vouchers. LOLOEE occasionally required that a portion of employees' pay be redeemed as a store voucher that could be used only for purchases at Viva Supermarkets. LOLOEE carried out this directive by requiring green checks or cash pay to be facilitated via the embedded Western Union franchises, which would distribute the vouchers as a portion of the employees' pay.

32.   Payment in Part in Check and in Part in Cash. LOLOEE evolved his payment method over time to include paying employees their regular hours per pay period via on-the-books bank check,

and then any additional hours in cash or other off-the-books methods, to avoid documentation of any overtime hours. LOLOEE would often continue to pay only regular time wages for hours worked in excess of 40 hours per workweek, even when pay at the one-and-a-half rate was required.

33. Salary Payments. In or about 2020, in an effort to avoid paying overtime wages, among other purposes, LOLOEE transitioned some employees who were previously paid hourly to "salary" positions. The purportedly salaried employees were assigned no higher than the hourly wage the employees were making, and, in some instances, the salaried wage was lower. LOLOEE deemed these positions to be "salary" positions even if the employee job responsibilities did not correspond to job duties exempted from the overtime pay requirements of the Fair Labor Standards Act. By reassigning employees to a salaried position, LOLOEE tried to avoid paying his employees overtime wages for overtime work and also tried to reduce his employment tax liability.

### *Manipulation of Time Data to Shave Hours*

34. Beginning at least in or about November 2017, LOLOEE, through M. SHAMS and S. SHAMS, used various methods to manipulate employee time data to lower LOLOEE's on-the-books payroll, to lower the expense of overtime pay, to lower LOLOEE's federal payroll tax obligation, and to lower LOLOEE's labor costs overall.

35. TimeClock Plus collected data via a system in which hourly workers punched in and out of their shifts by entering an individualized code into terminals located in each of the Viva Supermarket locations. Because workers occasionally forget to punch out of a shift, or forgot to punch in and out for lunch, among other reasons, TimeClock Plus offered employers the ability to override the employee punch-in/punch-out data collected by its software and correct the number of hours for which the employee would be paid. TimeClock Plus offered two options from which employers could elect to make such corrections: an automatic override option (which could be set to automatically round up time within five minutes of an hour, for example), and a manual override option.

36. Beginning at least in or about November 2017, M. SHAMS and S. SHAMS working at the direction of LOLOEE, used the manual-override option offered by TimeClock Plus to reduce hours of Viva Supermarkets employees and to delete employees from punch clock records altogether. The shaving down of hours and deleting employees had at least two purposes: (1) to deprive employees of

overtime pay they would be entitled to if their true number of hours were reported to Heartland Payroll, thus enriching LOLOEE, who kept the proceeds of any unpaid overtime; and (2) to deprive the IRS of the payroll tax obligation that LOLOEE would bear if the true hours were reported to Heartland Payroll.

37.    Beginning at least in or about November 2017, M. SHAMS and S. SHAMS, and others, at the direction of LOLOEE, modified the number of hours of Viva Supermarkets employees on the TimeClock Plus records in tens of thousands of instances, representing a significant percentage of all punch-clock recorded worker time.

38.    In many instances, these manual overrides were not legitimate corrections to fix problems such as a forgotten punch-out, but rather, were fraudulent manipulations of legitimate hours worked in order to create an appearance less overtime pay was owed to Viva Supermarket employees.  The shaving of legitimate hours worked also had the effect of reducing LOLOEE's federal payroll tax liability, among other unlawful benefits.

39.    In addition to shaving hours, between in or about November 2017 and in and about December 2019, LOLOEE also directed M. SHAMS and S. SHAMS, and others acting on his behalf, to entirely delete certain employees, typically employees who were also undocumented, from the payroll. The purpose of these deletions was at least three-fold: (1) to avoid scrutiny and any reporting requirements caused by his continued employment of undocumented workers; (2) to avoid paying these workers overtime; and (3) to lower his federal payroll tax obligation.

40.    M. SHAMS and S. SHAMS, and others acting on LOLOEE's behalf, transmitted these false timekeeping records to Heartland Payroll.  Heartland Payroll then prepared preview reports each pay period, which were emailed back to Viva Supermarkets, typically to S. SHAMS and M. SHAMS.

41.    S. SHAMS and M. SHAMS, acting on LOLOEE's behalf, approved the final worker hours and pay rates via email, among other means, prompting Heartland Payroll to prepare employees' paychecks for the corresponding pay period.  LOLOEE, through M. SHAMS and S. SHAMS, caused Heartland Payroll to prepare payroll checks based on falsified data, resulting in the disbursement of payroll checks that did not accurately reflect the wages owed to employees of Viva Supermarkets.

42.    As a result of the hours shaving, LOLOEE signed and caused to be distributed these paychecks to the Viva Supermarket employees knowing that the paychecks generated by Heartland

Payroll did not represent the full wages owed to his employees, nor did the paychecks contain correct federal tax withholdings and Social Security withholdings that would have been due if the true hours were transmitted to Heartland Payroll.

### *Falsification of Federal Taxes*

43.    At all times relevant to this Superseding Indictment, LOLOEE, together with his wife, were the 100% owners of all of the related Viva Supermarkets entities (SL One Global, Inc., Uni Foods, Inc., SMF Global, Inc., Nari Trading, Inc., Fresh Pak Produce, LLC, and Food Plus, LLC). Because each of these entities were S Corporations that were wholly owned by LOLOEE and his wife, all the profits or losses from these entities were reported on the individual income tax returns of the LOLOEEs each year. LOLOEE and his wife have filed separate income tax returns since 2015 and have split all income between their returns, including the profits or losses from each of the Viva Supermarkets entities.

44.    Between at least in or about November 2017 and October 2023, LOLOEE used various methods to unlawfully reduce his individual and corporate payroll tax liability, including: (a) paying himself wages off the books; (b) at times, shaving employees' hours on the timekeeping system that is used to calculate employer payroll tax liability; and (c) at times, moving a substantial part of his work-force off the books and paying them via cash or green check rather than a payroll check that would be reported to the IRS.

45.    Individual Taxes: Between in or about 2017 and in or about 2019, LOLOEE reduced his personal income tax liability by paying himself off-the-books, unreported wages through three of his Viva Supermarkets entities: Fresh Pak Produce, Food Plus and SL One Global. S. SHAMS reduced his personal income tax liability in the same way, by facilitating and accepting off-the-books wage payments to himself. M. SHAMS also reduced his personal income tax liability in the same way, by facilitating and accepting off-the-books wage payments to himself, including in the name of a fictitious nominee he directed payments to named "Jan Lee." In truth there was no "Jan Lee" owed wages, and it was just a fake name for M. Shams.

46.    Payroll Taxes: Employers who pay wages to their employees are required to withhold, truthfully account for, and pay over to the IRS a variety of taxes from employee wages, collectively

referred to as "payroll taxes." These taxes include federal income tax withholding, and Federal Insurance Contribution Act taxes, commonly known as Social Security and Medicare taxes. In addition to the Social Security taxes withheld from employees' wages, employers are also required to pay an "employer's share" of Social Security and Medicare taxes for each employee. These payroll taxes, including both the taxes withheld from employees' wages, and the employer's share of Social Security taxes, all of which are referred to in this Superseding Indictment as "federal payroll taxes" and "federal payroll tax liabilities," are required to be reported and paid to the IRS on a quarterly basis, with the quarters covering the periods of January through March, April through June, July through September, and October through December of each year. Employers use an Employer's Quarterly Federal Tax Return, Form 941, to report to the IRS the wages paid to employees, the total amount of federal income tax withheld, the total amount of Social Security and Medicare taxes withheld, and the total tax deposits.

47.    Beginning at least in or about 2017, LOLOEE reduced his federal payroll tax liability by hiding the true amount of wages paid to Viva Supermarkets employees. In a scheme that evolved over a number of years, LOLOEE paid wages in or about January 2017 through May 2017 through Food Plus, LLC, issuing paychecks to undocumented workers and others that were remitted to banks but were not reported on any federal employment tax returns. Beginning in or about May 2017, LOLOEE began paying undocumented workers and others through checks from Fresh Pak Produce, LLC, an entity that again did not report any wages on any federal tax return during the relevant time period. In or about December 2017, undocumented workers were instructed to cash their paychecks from Fresh Pak Produce only at the Western Union offices inside each of the supermarkets, and not at any bank. Continuing through 2018 and 2019, paychecks issued to workers from Fresh Pak Produce were typically not remitted to banks for payment, nor were they reported as wages on any of the employment tax returns filed for any of LOLOEE's Viva Supermarkets entities.

48.    At the direction of LOLOEE, M. SHAMS and S. SHAMS assisted in the execution of this tax scheme in various ways, including, together or individually: (a) keeping a second set of books that tracked cash and green check off-the-books payments to workers; (b) manipulating the TimeClock Plus entries to shave hours that had been legitimately worked; (c) transferring or causing the transfer of funds from each of the stores to Fresh Pak Produce in order for payroll to then be paid out of the Fresh

Pak Produce bank account; and (d) disguising off-the-books payments as other business expenses in order to take the deduction.

### *Labor Violations and Obstruction of Labor Investigations*

49. The United States Department of Labor, Wage and Hour Division conducted three investigations involving Viva Supermarkets. During these investigations, Department of Labor investigators conducted interviews and site visits to verify, among other things, that workers at Viva Supermarkets were paid properly according to applicable federal labor laws.

50. The employment of undocumented workers emboldened LOLOEE and MONTOYA to commit labor violations based on the assumption that undocumented workers would be less likely to complain about the employment conditions. LOLOEE exercised control over his undocumented workforce to attempt to thwart federal labor investigations into his supermarkets.

51. First Department of Labor Investigation. The Wage and Hour Division began an investigation into the wage and hour practices of SL One Global, Inc. (Viva Supermarket), and LOLOEE, from on or about November 10, 2008, through on or about May 26, 2009. In the course of this investigation, the Wage and Hour Division determined that SL One Global, Inc., and LOLOEE had violated multiple provisions of the Fair Labor Standards Act (29 U.S.C. §§ 201, et. seq.), including a finding that LOLOEE and his corporate entity owed employees of Viva Supermarkets back wages. LOLOEE and his corporate entity entered into a written agreement to pay approximately $3,496.18 in back wages.

52. Second Department of Labor Investigation. The Wage and Hour Division began a second investigation into the wage and hour practices of LOLOEE from between on or about February 20, 2018, through on or about February 19, 2020. The second investigation focused on the Norwood Viva Supermarket location. This second investigation revealed that LOLOEE had again violated the Fair Labor Standards Act, including its overtime pay requirements set forth in 29 U.S.C. § 207. The agency made a finding that LOLOEE and his corporate entity once again owed employees back pay. LOLOEE and his corporate entity entered a written agreement to pay approximately $35,423.35 in back wages.

53. Third Department of Labor Investigation. The Wage and Hour Division began a third

investigation in or about September 2020 into the wage and hour practices of LOLOEE. This third investigation initially also focused on the Norwood Viva Supermarket location, and only from between in or about February 2020 to in or about November 2020. In or about February 2021, the agency expanded the investigation to include all Viva Supermarket locations and a three-year period from between in or about October 23, 2017 through in or about May 16, 2021. As part of this third investigation, the Wage and Hour Division sent an agency investigator to the Viva Supermarket stores for the purpose of encountering employees in their workplace and conducting interviews. Agency investigators also conducted interviews of both LOLOEE and MONTOYA in furtherance of their investigation. In 2022, the Department of Labor filed a lawsuit under the Fair Labor Standards Act relating to the agency's investigation of LOLOEE, MONTOYA, and the Viva Supermarkets. At the conclusion of this third investigation, the Wage and Hour Division informed LOLOEE that the agency was seeking to collect approximately $1,500,000 in back wages, liquidated damages, and civil monetary penalties.

54.    Obstructive Conduct. To discourage Viva Supermarket employees from complying with the Department of Labor investigations, LOLOEE and MONTOYA employed various tactics, including: (a) threatening adverse immigration consequences if employees cooperated with the agency's investigation; (b) directing employees to lie about aspects of their employment, including the start date of their Viva Supermarkets employment; (c) directing employees to work in secluded areas of the store in order to prevent contact with agency investigators; (d) instructing employees not to speak with agency investigators; (e) directing some employees to impersonate agency investigators in order to gather information and identify other employees who cooperated with the agency's investigation; (f) directing employees to take off their store uniforms to make them look like customers when agency investigators were present; (g) listening in on at least one employee interview with agency investigators to influence the answers provided; (h) hiring someone to act as though they were a customer while following the agency investigator through the store to learn what the investigator was asking about and being told; and (i) manipulating employee schedules to avoid having undocumented workers and other employees who may be forthright with the investigator present when the investigator visited the stores.

55.    Return of Back Wages. In addition, without the knowledge or approval of the

Department of Labor, LOLOEE and MONTOYA asked employees who had received back wage payments in resolution of the second Wage and Hour Division investigation to return those payments to LOLOEE.

56.    Loloee Made False Statements to Investigators. LOLOEE was interviewed by Department of Labor investigators and made false statements, including the false statements that he never paid employees in green checks, cash, or any other irregular manner.

57.    Montoya Made False Statements to Investigators. MONTOYA also made false statements to a Department of Labor investigator, including, among others, that no employee had ever received cash payments, and that all employees had always been paid with paychecks.

COUNT ONE: [18 U.S.C. § 371 – Conspiracy to Defraud the United States and to Violate 18 U.S.C. §§ 1546 and 1505]

The Grand Jury charges:

SHAHRIR "SEAN" LOLOEE and
KARLA MONTOYA,

defendants herein, as follows:

**THE CONSPIRACY AND ITS OBJECTS**

1.    Beginning in at least in or about April 2014 and continuing through in or about October 2023, in the State and Eastern District of California and elsewhere, LOLOEE and MONTOYA, did knowingly and intentionally combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury to defraud the United States and an agency thereof, to wit, the United States Department of Labor, and to commit offenses against the United States of America, to wit, to violate Title 18, United States Code, Sections 1546(a), 1546(b), and 1505. The following were each objects of the conspiracy:

(a)    To defraud the United States and the United States Department of Labor by and through deceitful and dishonest means for the purpose of impeding, impairing, obstructing, and defeating the lawful governmental functions of the Department of Labor in investigating, assessing, and enforcing violations of applicable federal labor laws, to wit, federal overtime pay requirements;

SUPERSEDING INDICTMENT

14

(b) To knowingly use, attempt to use, possess, obtain, accept, and receive any document prescribed by statute and regulation as evidence of authorized employment in the United States, knowing it to be forged, counterfeited, altered, and falsely made, and to have been otherwise procured by fraud and unlawfully obtained, in violation of Title 18, United States Code, Section 1546(a);

(c) To use an identification document, knowing and having reason to know that the document was not issued lawfully for the use of the possessor, and knowing and having reason to know that the document was false, for the purpose of satisfying a requirement of section 274A(b) of the Immigration and Nationality Act, in violation of Title 18, United States Code, Section 1546(b); and

(d) To corruptly influence, obstruct, and impede, and endeavor to influence, obstruct, and impede, the due and proper administration of the law under which a pending proceeding regarding potential violations of federal labor laws was being had before the United States Department of Labor, Wage and Hour Division, in violation of Title 18, United States Code, Section 1505.

## MANNER AND MEANS

In furtherance of the conspiracy, LOLOEE and MONTOYA employed, among others, the following ways and means:

2. It was a part of the conspiracy that LOLOEE and MONTOYA engaged in and caused others to engage in the conduct described in the Introductory Allegations of this Superseding Indictment. Paragraphs 1 through 33 and 49 through 57 of the Introductory Allegations of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

3. It was also a part of the conspiracy that LOLOEE and MONTOYA committed and caused to be committed the overt acts listed below.

## OVERT ACTS

4. In furtherance of said conspiracy and to accomplish its objects, at least one of the conspirators committed, or caused to be committed, in the State and Eastern District of California, the following overt acts, among others:

SUPERSEDING INDICTMENT                                    15

(a)  In or about April 2014, MONTOYA instructed Employee 1 to go to a location in South Sacramento in order to obtain fraudulent employment documents. MONTOYA and LOLOEE then accepted and received these fraudulent documents for verification of Employee 1's employment eligibility.

(b)  In or about April 2014, MONTOYA and LOLOEE hired Employee 1 for a position at Viva Supermarkets.

(c)  From in or about January 2016 through in or about October 2023, MONTOYA and LOLOEE possessed the Social Security card and Permanent Resident Card of Employee 10.

(d)  In or about August 2016, MONTOYA and LOLOEE accepted and received a counterfeit and falsely made Social Security card to hire Employee 2 at Viva Supermarkets.

(e)  In or about February 2017, MONTOYA and LOLOEE accepted and received a counterfeit and falsely made Social Security card and a counterfeit and falsely made Permanent Resident Card to hire Employee 16 at Viva Supermarkets.

(f)  In or about March 2017, MONTOYA and LOLOEE accepted and received a fraudulent Social Security card to hire Employee 3 at Viva Supermarkets.

(g)  From in or about June 2018 through in or about October 2023, MONTOYA and LOLOEE possessed the Social Security card and Permanent Resident Card of Employee 9.

(h)  In or about February 2020, MONTOYA directed one or more individuals to follow Wage and Hour Division investigators while they conducted site visits at the Viva Supermarket locations, to listen to investigators' conversations with employees.

(i)  In or about February 2020, MONTOYA and LOLOEE directed and caused others to direct certain employees to hide during one or more Wage and Hour Division investigator visits.

(j)  In or about February 2020, during the second Department of Labor investigation,

LOLOEE held an all-hands meeting of Viva Supermarket employees at which LOLOEE stated that he wanted to know if workers were with him or against him and indicated that if they were against him that they should leave.

(k)    In or about February 2020, MONTOYA stated to a Department of Labor investigator that no employee works more than 40 hours per week.

(l)    In or about March 2020, LOLOEE provided the Department of Labor a list of Viva Supermarket employees in connection with the second investigation. The list that LOLOEE provided listed a 2020 hire date for employees who had actually been employed by LOLOEE for years.

(m)    In or about April 2020, MONTOYA and LOLOEE accepted and received a fraudulent Social Security card to hire Employee 4 at Viva Supermarkets.

(n)    In or about April 2020, MONTOYA and LOLOEE hired Employee 4 for a position at Viva Supermarkets.

(o)    On or about May 14, 2020, LOLOEE told a Department of Labor investigator that he did not pay any Viva Supermarket employees in cash.

(p)    In or about 2020, LOLOEE called Employee 5 into his office. LOLOEE instructed Employee 5 to deposit the back wages check she had received from the settlement of the second Department of Labor investigation into a bank, but then to give the money back to LOLOEE.

(q)    In or about 2020, MONTOYA instructed Employee 6 that she had to return the back wages she had received from the settlement of the second Department of Labor investigation to LOLOEE. MONTOYA said that LOLOEE does not owe anyone money and that every employee was paid what they were owed. MONTOYA further stated that LOLOEE was obligated to pay his employees with those settlement checks but reemphasized that nothing was owed to the employees.

(r)    On or about November 19, 2020, LOLOEE told a Department of Labor investigator that it was not true that he had requested back wage money to be paid

back to him from any Viva Supermarket employees.

(s)   In or about late 2020, MONTOYA directed Employee 3 into a Viva Supermarket administrative office and informed her that Viva Supermarkets was once again being investigated by the Department of Labor.  MONTOYA instructed Employee 3 to tell the investigators that she started working at the Viva Supermarkets that same year, 2020, when in truth and as MONTOYA knew, Employee 3 had been a Viva Supermarkets employee since at least in or about 2017.

(t)   In or about late 2020, LOLOEE held an all-hands meeting regarding the third Department of Labor investigation.  At this meeting, LOLOEE demanded that any employee who received a letter communication from the Wage and Hour Division should provide the letter to him.

(u)   In or about November 2020, LOLOEE provided the Department of Labor a list of Norwood location Viva Supermarket employees in connection with the third Wage and Hour Division investigation.  The list that LOLOEE provided listed a 2020 employment hire date for employees who had actually been employed by LOLOEE for years.

(v)   In or about December 2020, LOLOEE and MONTOYA directed that undocumented employee Employee 7 repay LOLOEE the back wages that LOLOEE had paid to him as a result of the second Department of Labor investigation and settlement.

(w)   In or about December 2020, LOLOEE directed undocumented employee Employee 7 to deposit the back wages check before repaying the back wages to LOLOEE.

(x)   In or about January 2021, LOLOEE hired Employee 25 for a position at Viva Supermarkets.

(y)   In or about January 2021, LOLOEE accepted, possessed, and received a counterfeit and falsely made Permanent Resident card and social security card

from Employee 25.

(z)     On or about February 19, 2021, LOLOEE told Department of Labor investigators that he never told any employees to "bring the money back," in reference to the returned back wage payments.

(aa)    On or about February 19, 2021, LOLOEE told Department of Labor investigators that employees had never been paid in cash or in green checks.

(bb)    In or about February 2021, LOLOEE provided the Department of Labor with Excel spreadsheets of Viva Supermarket employees at all four Viva Supermarket locations for the period of October 23, 2017, through in or about May 16, 2021. These spreadsheets indicated a 2020 hire date for employees who had been hired well before 2020.

(cc)    On or about March 12, 2021, LOLOEE told a Department of Labor investigator that "we have never paid anyone in cash."

(dd)    On or about March 16, 2021, MONTOYA told a Department of Labor investigator that she was not aware of any Viva Supermarket employees returning back wage payments to LOLOEE, and that she did not ask any employees to return the back wage payments.

(ee)    On or about March 16, 2021, MONTOYA told a Department of Labor investigator that no Viva Supermarket employee had ever received cash payments, and that all employees have always been paid in paychecks.

(ff)    On or about March 22, 2021, during the third Department of Labor investigation, MONTOYA joined and listened in on an employee interview with an agency investigator to influence that employee into denying that he had been asked to repay back wages that LOLOEE had paid him.

(gg)    On or about April 2, 2021, after LOLOEE came to possess letters from the Department of Labor attempting to contact Viva Supermarket employees regarding the third investigation commenced in September 2020, LOLOEE claimed to a Department of Labor investigator that the employees had given him

the letters voluntarily.

(hh)   On or about June 17, 2021, LOLOEE stated to Wage and Hour Division Investigators that none of his employees was ever paid in cash, voucher, or green check.

(ii)   On or about June 21, 2021, specific to the green checks, LOLOEE posited to Department of Labor investigators that his office was broken into a few years ago, and that perhaps the green checks were stolen at that time, as a way to explain Viva Supermarkets employees receiving pay via the green checks.

(jj)   On or about June 17, 2021, LOLOEE stated to Department of Labor investigators that Fresh Pak Produce, LLC, had been inactive for four years and should not be associated to any wage payments.

(kk)   On or about June 17, 2021, LOLOEE claimed to Department of Labor investigators that he was not affiliated with Western Union, and did not own or partly own the branch in his store.

(ll)   In or about June 2022, MONTOYA and LOLOEE accepted and received a counterfeit and falsely made Permanent Resident Card of Employee 19.

(mm)  In or about June 2022, MONTOYA and LOLOEE hired Employee 19 for a position at Viva Supermarkets.

(nn)   In or about August 2022, MONTOYA and LOLOEE accepted and received a counterfeit and falsely made Permanent Resident Card of Employee 21.

(oo)   In or about August 2022, MONTOYA and LOLOEE hired Employee 21 for a position at Viva Supermarkets.

All in violation of Title 18, United States Code, Section 371.

///
///
///
///
///

SUPERSEDING INDICTMENT                                    20

COUNT TWO: [18 U.S.C. § 371 – Conspiracy to Defraud the Internal Revenue Service]

The Grand Jury charges:

SHAHRIR "SEAN" LOLOEE,
MIRWAIS SHAMS, and
AHMAD "SHAH" SHAMS,

defendants herein, as follows:

## THE CONSPIRACY AND ITS OBJECT

1.      Beginning in at least in or about July 2016 and continuing through in or about October 2023, in the State and Eastern District of California and elsewhere, LOLOEE, M. SHAMS, and S. SHAMS did knowingly and intentionally combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of the revenue.  The object of the conspiracy was to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of the revenue, to wit, federal payroll taxes and federal individual income taxes.

## MANNER AND MEANS

In furtherance of the conspiracy, LOLOEE, M. SHAMS, and S. SHAMS employed, among others, the following ways and means:

2.      It was a part of the conspiracy that LOLOEE, M. SHAMS, and S. SHAMS, engaged in and caused others to engage in the conduct described in the Introductory Allegations of this Superseding Indictment. Paragraphs 1 through 14 and 23 through 48 of the Introductory Allegations of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

3.      It was also a part of the conspiracy that LOLOEE, M. SHAMS, and S. SHAMS committed and caused to be committed the overt acts listed below.

## OVERT ACTS

4.      In furtherance of said conspiracy and to accomplish its objects, at least one of the conspirators committed, or caused to be committed, in the State and Eastern District of California, the

following overt acts, among others:

(a) In or about 2016 through 2019, M. SHAMS maintained a second set of accounting books tracking off-the-book payments, in an excel spreadsheet he saved as "EXCESS PAYROLL 2016."

(b) On or about March 23, 2017, LOLOEE emailed his point of contact at Heartland Payroll introducing him to M. SHAMS, who he stated was Viva Supermarkets' new controller, for the purpose of having M. SHAMS upload time clock information to begin processing payroll with Heartland Payroll.

(c) On or about April 21, 2017, LOLOEE caused to be filed the Form 941 Employer's Quarterly Federal Tax Return for SL One, Global, Inc.

(d) On or about April 21, 2017, LOLOEE caused to be filed the Form 941, Employer's Quarterly Federal Tax Return for SMF Global, Inc.

(e) On or about August 18, 2017, LOLOEE paid himself wages by causing the issuance of a check to his wife in the amount of $5,000, via check number 11396 from the Cathay Bank Fresh Pak Produce account, with the memo line "Period Ending 08-13-17."

(f) On or about August 23, 2017, M. SHAMS forwarded S. SHAMS an email from Heartland Payroll informing him of the results of a social security number verification request. The Heartland Payroll email stated that for Uni Foods, Inc., 13 employees verified and 19 failed.

(g) On or about August 23, 2017, M. SHAMS forwarded S. SHAMS an email from Heartland Payroll informing him of the results of a social security number verification request. The Heartland Payroll email stated that for Nari Trading, Inc., 31 employees verified and 33 failed.

(h) On or about August 23, 2017, M. SHAMS forwarded S. SHAMS an email from Heartland Payroll informing him of the results of a social security number verification request. The Heartland Payroll email stated that for SL One Global, Inc., 35 employees verified and 43 failed.

(i)   On or about December 1, 2017, S. SHAMS prepared and LOLOEE signed a Fresh Pak Produce green check to Employee 14 for wages for six hours of work.

(j)   On or about March 30, 2018, LOLOEE paid himself wages by causing the issuance of a check to his wife in the amount of $5,000, via check number 1815 from the Food Plus, LLC, Wells Fargo bank account, with the memo line "Period Ended 03-25-2018."

(k)   On or about April 27, 2018, LOLOEE paid himself wages in the amount of $5,000, via check number 1837 from the Food Plus, LLC, Wells Fargo bank account, with the memo line "Pay Period Ended 04-22-2018."

(l)   On or about August 29, 2018, LOLOEE caused to be filed his Form 1040, Individual Income Tax Return for tax year 2017.

(m)   On or about September 23, 2018, S. SHAMS deleted time from his own punch-clock recorded hours from the TimeClock Plus application.

(n)   On or about September 24, 2018, M. SHAMS emailed LOLOEE regarding issuance of a money order to a worker representing his final paycheck with Viva Supermarkets.

(o)   On or about November 23, 2018, M. SHAMS cashed a check made out to himself at the Viva Supermarket Norwood location, for pay period ending November 4, 2018.

(p)   On or about February 14, 2019, M. SHAMS filed his Form 1040, Individual Income Tax Return for tax year 2018.

(q)   On or about April 12, 2019, M. SHAMS received wages from Food Plus, LLC, via a check made out to "Jan Lee" in the amount of $1,800.

(r)   On or about April 12, 2019, S. SHAMS received a check in the amount of $1,340 from Food Plus, LLC, comprising a portion of his wages for that pay period.

(s)   On or about April 15, 2019, S. SHAMS filed his Form 1040, Individual Income Tax Return for tax year 2018.

(t)   On or about April 26, 2019, M. SHAMS received wages from Food Plus, LLC,

via a check made out to "Jan Lee" in the amount of $1,800.

(u)    On or about April 26, 2019, S. SHAMS received a check in the amount of $1,340 from Food Plus, LLC, comprising a portion of his wages for that pay period.

(v)    On or about May 10, 2019, S. SHAMS received a check in the amount of $1,340 from Food Plus, LLC, comprising a portion of his wages for that pay period.

(w)    On or about May 10, 2019, M. SHAMS received wages from Food Plus, LLC, via a check made out to "Jan Lee" in the amount of $1,800.

(x)    On or about September 3, 2019, LOLOEE caused to be filed his Form 1040, Individual Income Tax Return for tax year 2018.

(y)    On or about January 31, 2020, M. SHAMS filed his Form 1040, Individual Income Tax Return for tax year 2019.

(z)    On or about February 25, 2020, S. SHAMS sent an email to Heartland Payroll requesting that they prepare amended payroll reports retroactively "for pay roll from 01-01-2019 ... to 01-26-2020," stating "please run additional payroll for it."

(aa)   When informed by Heartland Payroll that the amended payroll reports would impact prior quarter tax returns, on or about March 2, 2020, S. SHAMS forwarded a copy of this correspondence to M. SHAMS, stating "please see below email and let me know."

(bb)   On or about March 3, 2020, M. SHAMS forwarded the S. SHAMS email regarding the potential tax consequences of amending prior payroll reports to LOLOEE.

(cc)   On or about April 16, 2020, S. SHAMS filed his Form 1040, Individual Income Tax Return for tax year 2019.

(dd)   On or about May 28, 2020, M. SHAMS sent LOLOEE a text message listing initials and amounts, including: "M S. 5000", "J L. 2037," and "A S. 1226."

(ee)   On or about June 30, 2020, LOLOEE texted M. SHAMS regarding a particular Viva Supermarket store employee, inquiring "Did she get Fresh pak checks?"

(ff)   On or about June 30, 2020, M. SHAMS responded to LOLOEE via text message,

"Only three P P," indicating the employee in question only received Fresh Pak Produce checks for three pay periods. M. SHAMS then sent an additional text message clarifying, "Average 10 to 15 but three P P full."

(gg)  On or about June 30, 2020, LOLOEE responded to M. SHAMS via text message, "Can you please check the tax returns," and then sent a second clarifying text, message "Each store individually."

(hh)  On or about August 4, 2020, M. SHAMS sent LOLOEE a text message listing initials and amounts, including: "Mr. S. 5000," "A S. 1220," and "J L. 2036."

(ii)  On or about September 23, 2020, LOLOEE caused to be filed his Form 1040, Individual Income Tax Return for tax year 2019.

(jj)  On or about November 2, 2020, S. SHAMS, having been informed by email communication from Heartland Payroll that retroactively adding payroll checks onto the Viva Supermarkets payroll account would increase the Viva Supermarkets tax liability by approximately $27,887.82, falsely responded to Heartland Payroll that Viva Supermarkets had already processed the IRS Forms 1099 for these employees instead, causing Heartland Payroll to cancel the retroactive adjustment to the Viva Supermarkets 2019 payroll.

All in violation of Title 18, United States Code, Section 371.

COUNTS THREE THROUGH SIXTEEN: [18 U.S.C. § 1546(a) – Possession of False Immigration Documents; 18 U.S.C. § 2 – Aiding and Abetting]

The Grand Jury further charges: T H A T

SHAHRIAR "SEAN" LOLOEE and
KARLA MONTOYA,

defendants herein, on or about the dates listed below, in the State and Eastern District of California, did knowingly use, attempt to use, and possess an alien registration receipt card and any document prescribed by statute or regulation as evidence of authorized employment in the United States, knowing it to be forged, counterfeited, altered, and falsely made, and to have been otherwise procured by fraud and unlawfully obtained, and did knowingly aid, abet, assist, counsel, command, induce, and procure the

same, as set forth more fully in the table below:

| Count | On or About Possession Date | Fraudulent Document | Name of Employee |
|---|---|---|---|
| 3 | June 2018 to October 2023 | Social Security card and Permanent Resident Card | Employee 9 |
| 4 | January 2016 to October 2023 | Social Security card and Permanent Resident Card | Employee 10 |
| 5 | August 2018 to October 2023 | Social Security card and Permanent Resident Card | Employee 11 |
| 6 | March 2017 to March 2021 | Social Security card and Permanent Resident Card | Employee 3 |
| 7 | September 2014 to October 2023 | Social Security card and Permanent Resident Card | Employee 12 |
| 8 | November 2018 to October 2023 | Social Security card and Permanent Resident Card | Employee 13 |
| 9 | January 2016 to September 2020 | Social Security card and Permanent Resident Card | Employee 14 |
| 10 | January 2015 to March 2020 | Social Security card and Permanent Resident Card | Employee 1 |
| 11 | August 2016 to May 2021 | Social Security card | Employee 2 |
| 12 | November 2018 to October 2023 | Social Security card and Permanent Resident Card | Employee 15 |
| 13 | February 2017 to October 2023 | Social Security card and Permanent Resident Card | Employee 16 |
| 14 | April 2018 to October 2023 | Social Security card and Permanent Resident Card | Employee 17 |
| 15 | July 2017 to October 2023 | Social Security card and Permanent Resident Card | Employee 18 |
| 16 | April 2016 to October 2023 | Social Security card and Permanent Resident Card | Karla MONTOYA |

All in violation of Title 18, United States Code, Sections 2 and 1546(a).

COUNTS SEVENTEEN THROUGH TWENTY-TWO: [18 U.S.C. § 1546(a) – Possession, Acceptance and Receipt of False Immigration Documents; 18 U.S.C. § 2 – Aiding and Abetting]

The Grand Jury further charges: T H A T

SHAHRIAR "SEAN" LOLOEE and
KARLA MONTOYA,

defendants herein, on or about the dates listed below, in the State and Eastern District of California, did knowingly use, attempt to use, possess, obtain, accept, and receive an alien registration receipt card and

SUPERSEDING INDICTMENT

26

any document prescribed by statute or regulation as evidence of authorized employment in the United States, knowing it to be forged, counterfeited, altered, and falsely made, and to have been otherwise procured by fraud and unlawfully obtained, and did knowingly aid, abet, assist, counsel, command, induce, and procure the same, as set forth more fully in the table below:

| Count | Defendant | On or About Possession, Acceptance, and Receipt Date | Fraudulent Document | Name of Employee |
|---|---|---|---|---|
| 17 | LOLOEE | January 2021 | Permanent Resident Card and Social Security card | Employee 25 |
| 18 | LOLOEE, MONTOYA | April 2020 | Social Security card | Employee 4 |
| 19 | LOLOEE, MONTOYA | June 2022 | Permanent Resident Card | Employee 19 |
| 20 | LOLOEE, MONTOYA | April 2023 | Permanent Resident Card | Employee 20 |
| 21 | LOLOEE, MONTOYA | August 2022 | Permanent Resident card | Employee 21 |
| 22 | LOLOEE, MONTOYA | April 2019 | Permanent Resident Card and Social Security card | Employee 23 |

All in violation of Title 18, United States Code, Sections 2 and 1546(a).

COUNT TWENTY-THREE: [18 U.S.C. § 1505 – Obstruction of Agency Proceeding]

The Grand Jury further charges:

SHAHRIAR "SEAN" LOLOEE and
KARLA MONTOYA,

defendants herein, as follows:

1.    The factual allegations contained in paragraphs 1 through 33 and 49 through 57 of the Introductory Allegations and paragraphs 3 and 4 of Count One of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

2.    From in or about January 2020 through in or about September 2020, in the State and Eastern District of California and elsewhere, LOLOEE and MONTOYA did corruptly influence, obstruct, and impede and endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before any department or agency of the United States, that is, the second Department of Labor Wage and Hour Division investigation of Viva

SUPERSEDING INDICTMENT

Supermarkets, by, among other actions, directing and causing others to direct certain workers to hide to prevent to those workers from being questioned by agency investigators, and by providing materially false statements to a Department of Labor investigator regarding the employees working at Viva Supermarkets and overtime pay, in violation of Title 18, United States Code, Sections 2 and 1505.

COUNT TWENTY-FOUR: [18 U.S.C. § 1505 – Obstruction of Agency Proceeding]

The Grand Jury further charges:

SHAHRIAR "SEAN" LOLOEE and
KARLA MONTOYA,

defendants herein, as follows:

1.    The factual allegations contained in paragraphs 1 through 33 and 49 through 57 of the Introductory Allegations and paragraphs 3 and 4 of Count One of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

2.    From in or about November 2020 through in or about July 2021, in the State and Eastern District of California and elsewhere, LOLOEE and MONTOYA did corruptly influence, obstruct, and impede, and endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before any department or agency of the United States, that is, the third Department of Labor Wage and Hour Division investigation of Viva Supermarkets, by, among other actions, demanding investigation letters received by employees as a means of obstructing employee participation in the investigation, by directing at least one employee to lie to agency investigators about her employment start date, by listening in on an employee interview with an agency investigator for the purpose of influencing the employee to make materially false statements, and by providing materially false statements to Department of Labor investigators regarding the manner of payments to employees working at Viva Supermarkets and overtime pay, in violation of Title 18, United States Code, Sections 2 and 1505.

///

///

///

///

COUNTS TWENTY-FIVE THROUGH TWENTY-SEVEN: [18 U.S.C. § 1519 – Falsification of Records]

The Grand Jury further charges:

SHAHRIAR "SEAN" LOLOEE,

defendant herein, as follows:

1.    The factual allegations contained in paragraphs 1 through 33 and 49 through 57 of the Introductory Allegations and paragraphs 3 and 4 of Count One of this Superseding Indictment are realleged and incorporated as though fully set forth herein.

2.    On or about the following dates, in the State and Eastern District of California and elsewhere, LOLOEE did knowingly alter, falsify, and make a false entry in a record and document with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of any department or agency of the United States, that is, the Department of Labor Wage and Hour Division investigations of Viva Supermarkets, as detailed more fully in the table below:

| Count | On or About Date | Document | Matter |
|---|---|---|---|
| 25 | May 2020 | List of Viva Supermarket (Norwood location) employees from February 2018 through February 2020 | Second Wage and Hour Division investigation |
| 26 | November 2020 | List of Viva Supermarket (Norwood location) employees from February 2020 through November 2020 | Third Wage and Hour Division investigation |
| 27 | February 2021 | Excel Spreadsheet lists of Viva Supermarket (all locations) employees from October 2017 through February 2021 | Third Wage and Hour Division investigation |

All in violation of Title 18, United States Code, Sections 2 and 1519.

///
///
///
///

COUNTS TWENTY-EIGHT THROUGH FORTY-THREE: [26 U.S.C. § 7202 – Willful Failure to Collect or Pay Over Tax]

The Grand Jury further charges:

SHAHRIAR "SEAN" LOLOEE,

defendant herein, as follows:

1.     The factual allegations contained in paragraphs 1 through 14 and 23 through 48 of the Introductory Allegations and paragraphs 3 and 4 of Count Two of this Superseding Indictment are realleged and incorporated as though fully set forth herein.

2.     At all times relevant to this Superseding Indictment, LOLOEE was a person required to collect, account for on quarterly Forms 941, and pay over to the IRS on behalf of each entity listed in the table below, the federal payroll taxes imposed on the employees of those entities by the Internal Revenue Code.

3.     On or about the dates listed below, in the State and Eastern District of California and elsewhere, LOLOEE did willfully fail to collect, truthfully account for, and pay over the federal payroll taxes due and owing to the Internal Revenue Service, for the entities and calendar quarters set forth in the table below:

| Count | On or About Filing Date of Return | Entity | Period | Approximate Unpaid Balance of Federal Payroll Taxes |
|---|---|---|---|---|
| 28 | April 21, 2017 | SL One Global, Inc. | Q1 2017 | $11,408 |
| 29 | July 21, 2017 | SL One Global, Inc. | Q2 2017 | $12,071 |
| 30 | November 7, 2017 | SL One Global, Inc. | Q3 2017 | $13,265 |
| 31 | January 25, 2018 | SL One Global, Inc. | Q4 2017 | $5,475 |
| 32 | April 21, 2017 | SMF Global, Inc. | Q1 2017 | $1,871 |

| 33 | July 21, 2017 | SMF Global, Inc. | Q2 2017 | $2,004 |
| 34 | November 7, 2017 | SMF Global, Inc. | Q3 2017 | $2,481 |
| 35 | January 28, 2018 | SMF Global, Inc. | Q4 2017 | $398 |
| 36 | April 21, 2017 | Nari Trading, Inc. | Q1 2017 | $4,810 |
| 37 | July 21, 2017 | Nari Trading, Inc. | Q2 2017 | $4,341 |
| 38 | November 7, 2017 | Nari Trading, Inc. | Q3 2017 | $8,585 |
| 39 | January 28, 2018 | Nari Trading, Inc. | Q4 2017 | $1,752 |
| 40 | April 21, 2017 | Uni Foods, Inc. | Q1 2017 | $5,130 |
| 41 | July 21, 2017 | Uni Foods, Inc. | Q2 2017 | $5,871 |
| 42 | November 7, 2017 | Uni Foods, Inc. | Q3 2017 | $7,081 |
| 43 | January 28, 2018 | Uni Foods, Inc. | Q4 2017 | $1,183 |

All in violation of Title 26, United States Code, Sections 2 and 7202.

///

///

///

SUPERSEDING INDICTMENT

31

COUNTS FORTY-FOUR THROUGH FIFTY: [26 U.S.C. § 7206(1) – False Tax Return]

The Grand Jury further charges:

SHAHRIAR "SEAN" LOLOEE,
MIRWAIS SHAMS,
AHMAD "SHAH" SHAMS,

defendants herein, on or about the dates listed below, in the State and Eastern District of California and elsewhere, did willfully make and subscribe, and file and cause to be filed with the Internal Revenue Service, a U.S. Individual Tax Return, Form 1040, for the calendar years listed below, which was verified by a written declaration that it was made under the penalties of perjury and which the defendant specified for each count did not believe to be true and correct as to every material matter, as set forth in the table below:

| Count | Defendant | On or About Date | Event | Tax Year | False Declaration |
|-------|-----------|------------------|-------|----------|-------------------|
| 44 | LOLOEE | August 29, 2018 | Signature Authorization | 2017 | Form 1040 did not report approximately $28,192 in wages received from Food Plus, LLC |
| 45 | LOLOEE | August 22, 2019 | Signature Authorization | 2018 | Form 1040 did not report approximately $62,500 in wages received from Food Plus, LLC |
| 46 | LOLOEE | September 20, 2020 | Signature Authorization | 2019 | Form 1040 did not report approximately $67,500 in wages received from Food Plus, LLC |
| 47 | M. SHAMS | February 14, 2019 | Electronic Filing | 2018 | Form 1040 did not include approximately $36,600 in wages from Food Plus, LLC |
| 48 | M. SHAMS | January 31, 2020 | Electronic Filing | 2019 | Form 1040 did not include approximately $37,950 in wages from Food Plus, LLC |
| 49 | S. SHAMS | April 15, 2019 | Electronic Filing | 2018 | Form 1040 did not include approximately $27,681 in wages from Food Plus, LLC |
| 50 | S. SHAMS | April 16, 2020 | Electronic Filing | 2019 | Form 1040 did not include approximately $27,190 in wages from Food Plus, LLC |

SUPERSEDING INDICTMENT

Case 2:23-cr-00320-TLN    Document 33    Filed 03/21/24    Page 33 of 49

All in violation of Title 26, United States Code, Sections 2 and 7206(1).

<u>COUNTS FIFTY-ONE THROUGH FIFTY-THREE</u>: [18 U.S.C. § 1343 – Wire Fraud]

The Grand Jury further charges:

SHAHRIAR "SEAN" LOLOEE,

defendant herein, as follows:

### BACKGROUND

At all relevant times,

#### *The Small Business Administration*

1.     The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

#### *The Restaurant Revitalization Fund*

2.     The American Rescue Plan Act of 2021 ("ARP") was a federal law enacted in or around March 2021 that was designed to provide emergency financial assistance to the millions of Americans suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the ARP was the authorization of up to $28.6 billion in funding to restaurants and other eligible businesses for payroll and certain other expenses, through a program referred to as the Restaurant Revitalization Fund ("RRF").  The purpose of the RRF was to support the restaurant industry by providing funding to those that had suffered significant pandemic-related revenue loss.  The RRF also included specific requirements to ensure equitable distribution to small business concerns owned by women, veterans, and socially and economically disadvantaged applicants.

3.     Under the RRF, the SBA provided funding of up to $5,000,000 per location (not to exceed $10,000,000 total for the applicant and any affiliated businesses) for applicants who met certain conditions.  The amount of an applicant's RRF award was calculated as the applicant's 2019 gross receipts, minus the applicant's 2020 gross receipts, minus the amount of any loans the applicant may have received under the Paycheck Protection Program, which was a source of relief provided by the

SUPERSEDING INDICTMENT                                33

Coronavirus Aid, Relief, and Economic Security Act.

4.     RRF awardees were not required to repay funds received under the RRF unless the funds were used for unauthorized purposes, if the funds were not used by March 11, 2023, or the awardee permanently closed before using all funds on authorized purposes. Authorized purposes included, among other things, payroll costs, payments on any business mortgage, business rent payments, business debt service, business utility payments, business maintenance expenses, construction of outdoor seating, business supplies, business food and beverage expenses, covered supplier costs, and business operating expenses.

5.     To obtain RRF funds, a qualifying business had to submit an application signed by an Authorized Representative of the business. The RRF application required the business, through its Authorized Representative, to make certain affirmative certifications to be eligible to obtain the RRF funds. In the RRF application, the business, through its Authorized Representative, had to state, among other things: (a) its 2019 gross receipts as reported on its 2019 federal tax return; (b) its 2020 gross receipts as reported or to be reported on its 2020 federal tax return; (c) that the business had not permanently closed; and (d) that current economic uncertainty made the funding request necessary to support the ongoing or anticipated operations of the applicant. The Authorized Representative also had to certify that, by March 11, 2023, he or she would certify to the SBA that the business used all of the RRF funds only for authorized purposes. Additionally, the Authorized Representative had to certify that he or she understood that knowingly making a false statement to obtain a grant from SBA is punishable as a crime.

6.     RRF applications were received through a cloud-based platform through the AWS GOV server located in Oregon. The SBA transmitted RRF funds to awardees through the United States Department of Treasury's Financial Management Service ("FMS") server located in Virginia.

**SCHEME TO DEFRAUD**

7.     From on or about May 3, 2021, through on or about March 11, 2023, in the State and Eastern District of California, defendant SHAHRIAR "SEAN" LOLOEE knowingly devised, intended to devise, and participated in a material scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, promises, half-truths, and the concealment of

material facts.

**PURPOSE OF THE SCHEME**

8.      The purpose of the scheme and artifice to defraud was for LOLOEE to enrich himself unlawfully by obtaining RRF funds through the submission of fraudulent RRF applications to the SBA.

**MANNER AND MEANS**

In furtherance of the scheme and artifice to defraud, LOLOEE employed, among others, the following manner and means:

9.      LOLOEE submitted and caused to be submitted two fraudulent RRF applications to the SBA for the purpose of obtaining RRF funds.

10.      On or about May 3, 2021, LOLOEE submitted and caused to be submitted to the SBA an RRF application on behalf of SMF Global, Inc., that he signed as the corporation's Authorized Representative.  In the application, LOLOEE listed himself as the 100% owner of SMF Global, Inc., and requested that RRF funds be deposited in a Cathay Bank account he controlled that was held in the name of SMF Global, Inc.  LOLOEE included in the SMF Global, Inc., application materially false and fraudulent information, including a representation that SMF Global, Inc.'s 2020 gross receipts were approximately $3,800,000, when he knew the actual gross receipts were much greater than that amount and, in fact, were approximately $5,800,000.  LOLOEE fraudulently reported SMF Global, Inc.'s gross receipts because he knew that, if he reported the actual amount, SMF Global, Inc., would be ineligible to receive RRF funds.  Based on his false and fraudulent representation of SMF Global, Inc.'s 2020 gross receipts, LOLOEE requested approximately $1,039,000 in RRF funds.  The SBA denied LOLOEE's request because he was unable to establish that SMF Global, Inc., qualified as a type of business eligible to receive RRF funds.

11.      On or about May 3, 2021, LOLOEE submitted and caused to be submitted to the SBA an RRF application on behalf of Nari Trading, Inc., that he signed as the corporation's Authorized Representative.  In the application, LOLOEE listed himself as the 100% owner of Nari Trading, Inc., and requested that RRF funds be deposited in a Cathay Bank account he controlled that was held in the name of Nari Trading, Inc. LOLOEE made materially false and fraudulent representations in the Nari Trading, Inc., application, including a representation that Nari Trading, Inc.'s 2020 gross receipts were

SUPERSEDING INDICTMENT

approximately $5,200,000, when he knew the actual gross receipts were much greater than that amount and, in fact, were approximately $7,700,000. LOLOEE fraudulently reported Nari Trading, Inc.'s gross receipts because he knew that, if he reported the actual amount, Nari Trading, Inc., would be ineligible to receive RRF funds. Based on his false and fraudulent representation of Nari Trading, Inc.'s 2020 gross receipts, LOLOEE requested and received approximately $1,200,000 in RRF funds.

12.    LOLOEE's false representations regarding the 2020 gross receipts of SMF Global, Inc. and Nari Trading, Inc. in his RRF applications had a natural tendency to influence, and were capable of influencing, SBA's decision whether to provide these companies RRF funds, and if so how much to provide. Businesses with a net increase in gross receipts from 2019 to 2020 were not eligible to receive RRF funds at all. For businesses with a net decrease in gross receipts from 2019 to 2020, the amount of RRF funding available depended on the size of that net decrease. By falsely reducing the 2020 gross receipts reported on his RRF applications, LOLOEE made his businesses appear eligible for over $2 million in RRF funding to which they were not entitled.

**USE OF THE INTERSTATE WIRES**

13.    On or about the dates listed below, in the State and Eastern District of California and elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud and attempting to do so, LOLOEE, as more specifically charged below, knowingly transmitted and caused to be transmitted by means of wire communications in interstate and foreign commerce the following writings, signs, signals, pictures, and sounds:

| Count | On or About Date | Wire Description |
|---|---|---|
| 51 | May 3, 2021 | Transmission of an RRF application to the SBA on behalf of SMF Global, Inc. |
| 52 | May 3, 2021 | Transmission of an RRF application to the SBA on behalf of Nari Trading, Inc. |
| 53 | May 25, 2021 | ACH transfer of approximately $1,198,486.71 from the SBA through the FMS to a Cathay Bank account ending 8380 in the name of Nari Trading, Inc., dba Viva Supermarket #4 |

All in violation of Title 18, United States Code, Sections 2 and 1343.

///

///

COUNTS FIFTY-FOUR THROUGH FIFTY-SIX: [18 U.S.C. § 1956(a)(1)(B)(i) – Money Laundering]

The Grand Jury further charges:

SHAHRIAR "SEAN" LOLOEE

defendant herein, as follows:

1. Paragraphs 1 through 12 of Counts Fifty-One through Fifty-Three of this Superseding Indictment are realleged and incorporated by reference as if fully set forth herein.

2. Following receipt of the funds referenced in Count Fifty-Three above, from on or about June 18, 2021, through on or about July 6, 2021, LOLOEE engaged in multiple transactions involving the SBA funds that resulted in approximately $949,900 being deposited into a Bank of America trust account ending 6504 in the name of one of LOLOEE's family members ("Trust Account"). Each of the transactions flowed from the Cathay Bank account ending 8380 in the name of Nari Trading Inc., dba Viva Supermarket #4 ("Nari Trading Account"), through business accounts held in the names of other corporations LOLOEE controlled and a Bank of America account ending 1529 in the names of LOLOEE and one of his family members ("LOLOEE Account"). LOLOEE initiated the movement of funds with 10 checks that he signed, all bearing the same issue date of June 18, 2021. LOLOEE completed the movement of funds with three bank transfers totaling approximately $949,900. Below is a summary of the transactions:

a. Funds flowing from the Nari Trading Account through Cathay Bank account ending 2153 in the name of Uni Foods Inc., dba Viva Supermarket #2 ("Uni Foods Account"), to the LOLOEE Account:

| Apx. Check Issue Date | Apx. Deposit Date | Check No. | Apx. Check Amount | Deposit Account | Memo |
|---|---|---|---|---|---|
| 6/18/21 | 6/21/21 | 11465 | $82,800 | Uni Foods Account | Return of Loan |
| 6/18/21 | 6/28/21 | 11010 | $41,400 | LOLOEE Account | Return of Loan |
| 6/18/21 | 6/23/21 | 11011 | $41,400 | LOLOEE Account | Return of Loan |

b. Funds flowing from the Nari Trading Account through Cathay Bank account ending 6620 in the name of SMF Global Inc., dba Viva Supermarket #3 ("SMF Global Account"), to the LOLOEE Account:

| Apx. Check Issue Date | Apx. Deposit Date | Check No. | Apx. Check Amount | Deposit Account | Memo |
|---|---|---|---|---|---|
| 6/18/21 | 6/21/21 | 11464 | $86,314.54 | SMF Global Account | Return of Loan |
| 6/18/21 | 6/23/21 | 11631 | $43,157.27 | LOLOEE Account | Return of Loan |
| 6/18/21 | 6/21/21 | 11632 | $43,157.27 | LOLOEE Account | Return of Loan |

SUPERSEDING INDICTMENT

37

c.   Funds flowing from the Nari Trading Account through Cathay Bank account ending 1041 in the name of SL One Global Inc., dba Viva Supermarket #3 ("SL One Account"), to the LOLOEE Account

| Apx. Check Issue Date | Apx. Deposit Date | Check No. | Apx. Check Amount | Deposit Account | Memo |
|---|---|---|---|---|---|
| 6/18/21 | 6/21/21 | 11463 | $780,805.46 | SL One Account | Return of Loan |
| 6/18/21 | 6/23/21 | 49670 | $260,268.48 | LOLOEE Account | Return of Loan |
| 6/18/21 | 6/21/21 | 49671 | $260,268.48 | LOLOEE Account | Return of Loan |
| 6/18/21 | 6/28/21 | 49672 | $260,268.48 | LOLOEE Account | Return of Loan |

d.   Bank transfers from the LOLOEE Account to the Trust Account:

| Apx. Transfer Date | Apx. Transfer Amount |
|---|---|
| 6/28/21 | $393,500 |
| 6/30/21 | $301,700 |
| 7/6/21 | $254,700 |
| Total: | $949,900 |

3.   On or about the dates set forth in the table below, in the State and Eastern District of California, and elsewhere, LOLOEE knowingly conducted and attempted to conduct financial transactions affecting interstate and foreign commerce that involved the proceeds of a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity:

| Count | On or About Date | Amount (approximate) | Transaction |
|---|---|---|---|
| 54 | June 28, 2021 | $393,500 | Transfer from LOLOEE Account to Trust Account |
| 55 | June 30, 2021 | $301,700 | Transfer from LOLOEE Account to Trust Account |
| 56 | July 6, 2021 | $254,700 | Transfer from LOLOEE Account to Trust Account |

All in violation of Title 18, United States Code, Sections 2 and 1956(a)(1)(B)(i).

///

///

///

///

SUPERSEDING INDICTMENT                              38

COUNT FIFTY-SEVEN: [18 U.S.C. § 1623(a) – Perjury]

The Grand Jury further charges:

AHMAD "SHAH" SHAMS,

defendant herein, as follows:

1.    On or about November 30, 2023, in the State and Eastern District of California, while under oath and testifying in a proceeding before a federal grand jury of the United States in the Eastern District of California, knowingly did make material false declarations, that is:

(a)    At the time and place alleged, the grand jury was conducting an investigation to determine whether violations of Title 26, United States Code, Section 7202 and 7206, as well as Title 18, United States Code, Section 371 had been committed with respect to the off-the-books payment scheme described in Counts Two and Twenty-Eight through Fifty of this Superseding Indictment.  It was material to said investigation that the grand jury ascertain whether Fresh Pak Produce was involved in facilitating off-the-books payments to Viva Supermarkets employees, whether employees were being paid off-the-books, and who had knowledge of and involvement in any such off-the-books payments, among other aspects of the investigation.

(b)    At the time and place alleged, S. SHAMS appearing as a witness under oath at a proceeding before the grand jury knowingly made the false declarations underlined below in response to questions with respect to the material matter alleged:

Q:    Have you ever heard of an entity called Fresh Pak Produce?

S. SHAMS:    No.

Q:    Okay. Have you ever heard of an entity called SL One?

S. SHAMS:    Yes.

Q:    What is that?

S. SHAMS:    This is the Viva Supermarket No. 1.  It called – it's One Global I-n-c., and dba vivasupermarkets.com.

Q:    Were you ever paid in cash?

SUPERSEDING INDICTMENT

39

S. SHAMS:      No.

Q:      Okay.  So for the entire time from 2016 to present, you've been paid on checks issued by a bank that you could deposit in your bank?

S. SHAMS:      Yes, ma'am

. . .

Q:      Okay.  I want to ask you again about Fresh Pak Produce, which you said before does not sound familiar to you.

S. SHAMS:      Yeah.  No.  The things I know is SL One, Nari Trading, SMF, and FoodPlus.

Q:      So if we were to see checks, what look like checks, from Fresh Pak Produce, made out to you, in your name, what would be the explanation for that?

S. SHAMS:      I didn't recall anything like that.

Q:      Okay.  Do you think -- now, this would have been a while ago.  This would have been in 2017.  As you think back, do you think it's possible you might have received checks at some point from Fresh Pak Produce?

S. SHAMS:      I don't remember anything from 2017 to now.  I don't remember.

2.      The underlined testimony of S. SHAMS, as he then and there well knew and believed, was false in that, among other things, he had heard of an entity called Fresh Pak Produce, he himself was paid off-the-books wages, and he did remember Fresh Pak Produce and receiving off-the-books wages from Fresh Pak Produce.

All in violation of Title 18, United States Code, Section 1623(a).

///

///

///

///

COUNTS FIFTY-EIGHT: [18 U.S.C. § 1623(a) – Perjury]

The Grand Jury further charges:

AHMAD "SHAH" SHAMS,

defendant herein, as follows:

1.    On or about November 30, 2023, in the State and Eastern District of California, while under oath and testifying in a proceeding before a federal grand jury of the United States in the Eastern District of California, knowingly did make material false declarations, that is:

(a)    At the time and place alleged, the grand jury was conducting an investigation to determine whether violations of Title 26, United States Code Section 7202 and 7206, as well as Title 18, United States Code 371 had been committed with respect to the off-the-books payment scheme described in Counts Two and Twenty-Eight through Fifty of this Superseding Indictment. It was material to said investigation that the grand jury ascertain whether, among other things, off-the-books wages were being paid to S. SHAMS and others, and whether any such off-the-books payments were being reported to the Internal Revenue Service for tax purposes, among other aspects of the investigation.

(b)    At the time and place alleged, S. SHAMS appearing as a witness under oath at a proceeding before the grand jury knowingly made the false declarations underlined below in response to questions with respect to the material matter alleged:

///
///
///
///
///
///
///
///
///
///

SUPERSEDING INDICTMENT                                41

Q:                Okay. You file your taxes every year?

S. SHAMS:         Yes.

Q:                All right. Do you report all of your income earned on your taxes?

S. SHAMS:         Yes.

Q:                Okay. And that includes any paychecks that you may receive from Mr. Loloee or from Viva Supermarkets?

S. SHAMS:         Yes.

                  . . .

Q:                Okay. If I say an off-the-book payment, do you understand what that phrase means?

S. SHAMS:         No. What this phrase means?

Q:                An employer might give you a regular paycheck and you report that paycheck on your taxes, usually with a Form W-2. Does that sound familiar so far?

S. SHAMS:         Yes. Each year, I get my W-2.

Q:                Okay. An off-the-book payment would be, in addition to doing that, the employer could also give you cash, or the employer could also give you a check from a different company so that when you file your income taxes, you wouldn't have a W-2 that related to that money, but it would still be income from your employer. That would be what I refer to as an off-the-book payment.

S. SHAMS:         No. When I get my payment, everything is in that check, and it's on my W-2.

Q:                Have you ever heard of anyone at Viva Supermarkets being paid off the books?

S. SHAMS:         No. I didn't hear.

2.    The underlined testimony of S. SHAMS, as he then and there well knew and believed, was false in that, among other things, S. SHAMS did not report all of his income earned on his tax returns, S. SHAMS did not report the income from all checks he received from LOLOEE, S. SHAMS's full wages were not fully reported on his W-2 forms, and S. SHAMS did in fact hear of employees being paid off the books at Viva Supermarkets, including because S. SHAMS himself received off-the-books

SUPERSEDING INDICTMENT                          42

wages from Fresh Pak Produce and he caused the preparation of off-the-books Fresh Pak Produce checks to others.

All in violation of Title 18, United States Code, Section 1623(a).

FORFEITURE ALLEGATION: [18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c) – Criminal Forfeiture]

1.    Upon conviction of one or more of the offenses alleged in Counts Two and Fifty-One through Fifty-Three of this Superseding Indictment, defendants SHAHRIAR "SEAN" LOLOEE, MIRWAIS SHAMS, and AHMAD "SHAH" SHAMS shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property, real and personal, which constitutes or is derived from proceeds traceable to such violations, including but not limited to the following:

    a.    Approximately $949,900.00 seized from Bank of America account number 0024 5216 6504,

    b.    Approximately $50,000.00 seized from Five Star Bank account number 3303096,

    c.    Approximately $22,465.94 seized from Cathay Bank account number 0022214070, and

    d.    A sum of money equal to the total amount of proceeds traceable to such offenses, for which defendant is convicted.

2.    Upon conviction of one or more of the offenses alleged in Counts Fifty-Four through Fifty-Six of this Superseding Indictment, defendant SHAHRIAR "SEAN" LOLOEE shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offenses, and any property traceable to such property, including but not limited to the following:

    a.    Approximately $949,900.00 seized from Bank of America account number 0024 5216 6504,

    b.    Approximately $50,000.00 seized from Five Star Bank account number 3303096,

    c.    Approximately $22,465.94 seized from Cathay Bank account number 0022214070, and

    d.    A sum of money equal to the amount of money involved in the offenses, for which defendant is convicted.

3.     If any property subject to forfeiture, as a result of the offenses alleged in Counts Two, and Fifty-One through Fifty-Six of this Superseding Indictment, for which defendants are convicted:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third party;

      c.     has been placed beyond the jurisdiction of the court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of defendant, up to the value of the property subject to forfeiture.

A TRUE BILL.

**/s/ Signature on file w/AUSA**

FOREPERSON

PHILLIP A. TALBERT
United States Attorney

No. _ _ _ _ _ _ _ _ _

_____

# UNITED STATES DISTRICT COURT

*Eastern District of California*

*Criminal Division*

## THE UNITED STATES OF AMERICA

*vs.*

SHAHRIAR "SEAN" LOLOEE
KARLA MONTOYA
MIRWAIS SHAMS, and
AHMAD "SHAH" SHAMS

_____

### S U P E R S E D I N G   I N D I C T M E N T

18 U.S.C. § 371 – Conspiracy to Defraud the Department of Labor, to Commit Immigration Document Fraud, and to Obstruct Justice; 18 U.S.C. § 371 – Conspiracy to Defraud the Internal Revenue Service; 18 U.S.C. § 1546(a) – Possession of False Immigration Documents (14 counts); 18 U.S.C. § 1546(a) – Possession, Acceptance and Receipt of False Immigration Documents (6 counts); 18 U.S.C. § 1505(c) – Obstruction of Agency Proceedings (2 counts); 18 U.S.C. § 1519 – Falsification of Records (3 counts); 26 U.S.C. § 7202 – Willful Failure to Collect or Pay Over Tax (16 counts); 26 U.S.C. § 7206(1) – False Tax Return (7 counts); 18 U.S.C. § 1343 – Wire Fraud (3 counts); 18 U.S.C. § 1956 – Money Laundering (3 counts); 18 U.S.C. § 1623(a) – Perjury (2 counts); 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c) – Criminal Forfeiture

_____

*A true bill,*            **/s/ Signature on file w/AUSA**

_____
                              *Foreman.*

*Filed in open court this* _ _ _ _ _ _ _

*of* _____ , *A.I*

March 21, 2024

__/s/ Shelly Her            DEBORAH BARNES
                           UNITED STATES MAGISTRATE JUDGE

_____

*Bail, $* _No further process necessary as to defendants Loloee and Montoya
         No bail bench warrants for defendants Mirwais Shams and Ahmad
         Shams._

<u>United States v. Loloee, et al.</u>
**Penalties for Indictment**

<u>Defendants</u>
**SHAHRIAR LOLOEE**
**KARLA MONTOYA**
**MIRWAIS SHAMS**
**AHMAD "SHAH" SHAMS**

| | |
|---|---|
| <u>**COUNT 1:**</u> | **LOLOEE and MONTOYA** |
| VIOLATION: | 18 U.S.C. § 371 – 18 U.S.C. § 371 – Conspiracy to Defraud the Department of Labor, to Commit Immigration Document Fraud, and to Obstruct Justice |
| PENALTIES: | Up to five years' imprisonment; or Fine of up to $250,000; or both fine and imprisonment Supervised release of up to 3 years |

SPECIAL ASSESSMENT: $100 (mandatory on each count)

| | |
|---|---|
| <u>**COUNT 2:**</u> | **LOLOEE, MIRWAIS SHAMS, and AHMAD "SHAH" SHAMS** |
| VIOLATION: | 18 U.S.C. § 371 – Conspiracy to Defraud the Internal Revenue Service |
| PENALTIES: | Up to ten years' imprisonment; or Fine of up to $250,000; or both fine and imprisonment Supervised release of up to 3 years |

SPECIAL ASSESSMENT: $100 (mandatory on each count)

| | |
|---|---|
| <u>**COUNTS 3-16:**</u> | **LOLOEE and MONTOYA** |
| VIOLATION: | 18 U.S.C. § 1546(a) – Possession of False Immigration Documents |
| PENALTIES: | Up to ten years' imprisonment; or Fine of up to $250,000; or both fine and imprisonment Supervised release of up to 3 years |

| | |
|---|---|
| <u>**COUNTS 17-22:**</u> | **LOLOEE and MONTOYA** |
| VIOLATION: | 18 U.S.C. § 1546(a) – Possession, Acceptance and Receipt of False Immigration Documents |
| PENALTIES: | Up to five years' imprisonment; or Fine of up to $250,000; or both fine and imprisonment |

Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 23:**       **LOLOEE**

VIOLATION:       18 U.S.C. § 1505 – Obstruction of Agency Proceeding

PENALTIES:       Up to twenty years' imprisonment; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 24:**       **LOLOEE and MONTOYA**

VIOLATION:       18 U.S.C. § 1505 – Obstruction of Agency Proceeding

PENALTIES:       Up to twenty years' imprisonment; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of up to 3 years

**COUNTS 25-27:**       **LOLOEE**

VIOLATION:       18 U.S.C. § 1519 – Falsification of Records

PENALTIES:       Up to twenty years' imprisonment; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNTS 28-43:**       **LOLOEE**

VIOLATION:       26 U.S.C. § 7202 – Willful Failure to Collect or Pay Over Tax

PENALTIES:       Up to five years' imprisonment;
Fine of up to $10,000; or both fine and imprisonment, together with the costs of prosecution
Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNTS 44-50:**    **LOLOEE, MIRWAIS SHAMS, and AHMAD "SHAH" SHAMS**

VIOLATION:    26 U.S.C. § 7206(1) – False Tax Return

PENALTIES:    Up to three years' imprisonment;
Fine of up to $100,000; or both fine and imprisonment, together with the costs of prosecution
Supervised release of up to 1 year

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNTS 51-53:**    **LOLOEE**

VIOLATION:    18 U.S.C. § 1343 – Wire Fraud

PENALTIES:    Up to twenty years' imprisonment; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNTS 54-56:**    **LOLOEE**

VIOLATION:    18 U.S.C. § 1956(a)(1)(B)(i) – Money Laundering

PENALTIES:    Up to twenty years' imprisonment; or
Fine of up to $500,000; or both fine and imprisonment
Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 57:**    **AHMAD "SHAH" SHAMS**

VIOLATION:    18 U.S.C. § 1623(a) – Perjury

PENALTIES:    Up to five years' imprisonment; or
Fine of up to $250,000; or both and imprisonment
Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 58:**          **AHMAD "SHAH" SHAMS**

VIOLATION:          18 U.S.C. § 1623(a) – Perjury

PENALTIES:          Up to five years' imprisonment; or
Fine of up to $250,000; or both and imprisonment
Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**FORFEITURE ALLEGATION:   LOLOEE, MIRWAIS SHAMS, and AHMAD "SHAH"
SHAMS**

VIOLATION:          18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1), and 28 U.S.C. § 2461(c)
– Criminal Forfeiture

PENALTIES:          As stated in the charging document